**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| LAJIM, LLC, PRAIRIE RIDGE GOLF COURSE, LLC, LOWELL BEGGS, and MARTHA KAI CONWAY, | ) ) ) | |
| Plaintiffs, | ) | No. 13 CV 50348 |
| | ) | Magistrate Judge Iain D. Johnston |
| v. | ) | |
| | ) | |
| GENERAL ELECTRIC CO., | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lowell Beggs contends that the golf course he bought in 2007 contains more hazards than just bunkers and a creek. Beggs alleges that the course also has toxic hazards migrating through the groundwater and soil under the course and his adjacent home. He and his business partners sued General Electric under multiple environmental statutes seeking a court order requiring General Electric to clean up and pay for the damage caused by the contaminants from its former plant. The parties have each moved for partial summary judgment on one of the environmental claims, and General Electric has moved for partial summary judgment on all of the state-law claims. For the reasons that follow, General Electric's motion for summary judgment on the state law claims [48] is granted, its motion for summary judgment on the federal environmental claim [57] is denied, and the plaintiffs' motion for summary judgment on the federal environmental claims [37] is granted as to liability.

## I.    BACKGROUND

### A.    General Electric Plant

The following facts are undisputed except where noted. From 1949 through 2010, General Electric operated a plant in Morrison, Illinois. The plant manufactured appliance and automotive controls for products, including refrigerators, air conditioners, and motor vehicles. During the relevant time, the manufacturing process involved using chlorinated organic solvents to remove oil from parts. The solvents included trichloroethylene ("TCE") through 1974, perchloroethene ("PCE") from 1973 through 1980, and 1,1,1 trichlorethane ("TCA") from 1974 through 1994. These solvents can break down into other matter, such as 1,2-dichloroethane ("1,2-DCA"), all of which are toxic and regulated by federal and state environmental agencies. General Electric stored the chlorinated solvents in degreasers located in the plant. The degreasers were decommissioned in 1994, when General Electric started cleaning parts with a soap-like solution.

In 1986, chlorinated solvents were detected in three municipal supply wells that provided water to the City of Morrison. The wells were located several thousand feet southeast of the

General Electric plant.  In 1987, the Illinois Environmental Protection Agency ("IEPA") subcontracted environmental consultant Mathes & Associates to install eight monitoring wells, and to sample and analyze water and sediment from Rock Creek and a storm water retention pond northwest of the General Electric plant.  A test Mathes performed in 1987 revealed 620 micrograms per liter ("µg/L") of TCE in one of the municipal water wells, far in excess of the 5 µg/L Maximum Contaminant Level ("MCL") for drinking water established by the United States Environmental Protection Agency ("U.S. EPA").  In addition, chlorinated solvents were discovered in groundwater obtained from two monitoring wells downgradient from (which is south of) the plant.  In 1988, a local newspaper reported that the IEPA had traced the source to the plant.

After a notice and request from the IEPA, in 1988, General Electric hired environmental consultant Canonie Environmental to perform a Phase II Remedial Investigation, including the installation of an additional six monitoring wells, with the IEPA overseeing Canonie's activities. That year, Canonie also installed an air stripper to treat water pumped from one municipal well so it could continue to supply water to the City of Morrison.  The other two municipal wells were sealed.

In March 1989, tests found TCE in at least four of the eight monitoring wells.  Canonie's report issued later that year concluded that while a "specific source of the VOCs [or volatile organic compounds] or the chlorides was not found" during the investigation, "the industrial complex [the site of General Electric's plant] is not a source of VOCs to the unconfined aquifer, and therefore remediation in the industrial complex is not appropriate."  Canonie Phase II Report [Plaintiffs' Statements of Fact [42] Ex. 23 at ES 1-2].  The Canonie Phase II Report did, however, recommend a soil gas survey be completed under the floor slab of the plant around the location of the degreasers.

Following issuance of the Canonie Phase II Report, on September 27, 1988, the IEPA issued a notice pursuant to § 4(q) of the state's Environmental Protection Act, which grants authority to "provide notice to any person who may be liable pursuant to Section 22.2(f) of this Act for a release or a substantial threat of a release of a hazardous substance or pesticide. Such notice shall include the identified response action and an opportunity for such person to perform the response action."  415 ILCS 5/4(q).

In 1989, Target Environmental Services conducted the soil gas survey recommended in the Canonie Report.  Soil gas samples revealed the presence of eight different chlorinated solvents, mostly TCE and TCA, and the highest levels were found in the area beneath the degreasers.

Under supervision of the IEPA, General Electric, through Canonie and its successor, Harrington Engineering & Construction, continued periodic testing of groundwater sampled from the monitoring wells.  General Electric did not, however, install any soil borings or monitoring wells at the location of the degreasers.

In June 1994, the IEPA issued a notice requiring a Phase III remediation investigation. After conferring with the IEPA, General Electric agreed to conduct a supplemental investigation to evaluate the groundwater downgradient from its plant.

In 1996, General Electric solicited proposals for a new environmental consultant to conduct the supplemental investigation of the groundwater at and downgradient from the plant. General Electric ultimately hired GeoTrans in 1999 to conduct a groundwater flow modeling and a natural attenuation analysis, including performing soil borings near the locations of the degreasers.

Two years later in 2001, GeoTrans issued its findings. According to its Natural Attenuation and Groundwater Modeling Report, the concentration of chlorinated solvents had decreased significantly by 2001, and the report concluded that contaminants would naturally attenuate to levels below the MCL. GeoTrans also concluded that Rock Creek was a regional groundwater divide that would prevent the chlorinated solvents from migrating to the south side of the creek. The report also found that the remaining concentrations of contaminants posed no risk to the public. According to GeoTrans, a City of Morrison ordinance prohibiting the use of private wells in the area and the air stripping treatment of groundwater from the affected municipal well eliminated any risk.

The IEPA responded to the GeoTrans report and stated that it "cannot approve the proposal for monitored natural attenuation as a remedy for this site" for numerous reasons, including that after 15 years concentrations of contaminant remained relatively high. In particular, the IEPA reported a finding of 12 µg/L at one well, which was higher than previous results, and 4,300 µg/L found at another well, all in excess of the 5 µg/L MCL. The IEPA concluded that active remediation would be appropriate.

In February 2004, the Illinois Attorney General filed suit against General Electric to recover costs the state had incurred because of General Electric's release of hazardous substances as well as an injunction requiring General Electric to determine the nature and extent of the soil and groundwater contamination, and then to perform remediation. The state's claims were brought under provisions of Illinois' Environmental Protection Act: Count I for cost recovery, *see* 415 ILCS 5/22.2(f); Count II to enjoin water pollution, *see* 415 ILCS 5/42(d), (e); and Count III to enjoin a water pollution hazard, *see* 415 ILCS 5/12(d). In December 2010, the Illinois Attorney General and General Electric entered into a Consent Order. Pursuant to the Consent Order, General Electric agreed to submit to the IEPA for its approval a series of plans and reports including: (1) a work plan to survey private wells, install additional monitoring wells, and complete additional soil borings; (2) a Focused Site Investigation Report ("FSI") summarizing the results of the work plan; (3) a Remedial Objectives Report to address the impact of the soil and groundwater contamination; and (4) a Remedial Action Plan to meet the remediation objectives within six years of the entry of the Consent Order.

After development of the approved work plan, General Electric installed monitoring wells along Rock Creek. In April 2013, General Electric submitted its FSI prepared by its environmental consulting firm, MWH Americas. The FSI detailed data obtained from the monitoring wells along Rock Creek and elsewhere. The FSI also contained data showing that

chlorinated solvents released at the General Electric plant had migrated south of the plant. Specifically, the data showed that in January 2012, TCE levels were 480 µg/L in the groundwater from one well along the creek (MW7-LS), and 4,800 µg/L in another (MW8-LS). Those wells are both 1,400 feet downgradient from the plant. In August 2012, those same two wells detected levels of 2,700 µg/L and 2,000 µg/L, respectively. Groundwater collected that same month from a supply well on the plaintiffs' golf course south of the plant detected TCE at a concentration of 5,000 µg/L, 1,000 times the MCL. Meanwhile, shallow "grab" groundwater samples from wells adjacent to the plant also detected contamination, yielded concentrations of 130 µg/L from one site (SB-17) and 2,200 µg/L from another site (MW-10). Tests of the groundwater obtained from private wells south of Rock Creek did not detect chlorinated solvents. However, an August 2012 test of groundwater collected from a supply well on the plaintiffs' golf course located south of Rock Creek detected TCE, although at 0.93 µg/L. The level falls under the MCL.[1]

After comments by the IEPA, General Electric submitted a supplemental work plan in August 2013 and an FSI Addendum in May 2014. In August 2014, the IEPA made additional comments to the FSI Addendum and withheld approval pending responses to the comments. In October 2014, MWH Americas submitted General Electric's responses.

Meanwhile, in 2010, the City of Morrison passed an ordinance that prohibited the use of groundwater as a supply of potable water, and prohibited the installation or drilling of wells in the city. The city passed the ordinance "to limit threats to human health from groundwater contamination while facilitating the redevelopment and productive use of properties that are the source of said chemical constituents." Ex. U to GE's Rule 56.1 on Count I [Dkt. 59-8].

## B. Prairie Ridge Golf Course

In 2007, plaintiff Lowell Beggs purchased the then-closed Prairie Ridge Golf Course in Morrison, Illinois. He conveyed the property to plaintiff Prairie Ridge Golf Course, LLC. Plaintiff LAJIM, LLC operates the course. Plaintiff Martha Kai Conway is Mr. Beggs' companion, and they moved into a home next to the course. The home is held in Ms. Conway's name. The golf course and the plaintiffs' home are both south of the General Electric plant and are both hydrogeologically downgradient from the plant.

Mr. Beggs first learned that the course was for sale in April 2007. At the time, the course was owned by Citizens First Bank of Morrison, which had acquired it in foreclosure. Mr. Beggs asked his real estate attorney Gary Gehlbach to gather information about the course, and Mr. Gehlbach wrote to Citizens First Bank requesting "whatever information you may possess that will help us put together an offer to purchase." Ex. L to GE's Rule 56.1 on State Law Claims [Dkt. 52]. In response, the bank provided a legal description of the property and financials from the last five years the course was in operation. Additionally, in an e-mail from Keith Hooks

---

[1] In their memorandum [38], the plaintiffs note the detection of other contaminants at levels exceeding the MCL. For instance, the plaintiffs note that the FSI reported levels of 1,2-DCE detected in groundwater at a concentration of 22,000 µg/L, over 314 times the MCL of 70 µg/L, and concentrations of vinyl chloride in groundwater at 1,200 µg/L, 600 times the MCL of 2 µg/L. But that data is not incorporated into any Rule 56.1 statement of fact and, as a result, the plaintiffs have not established that the data is undisputed.

dated May 1, 2007, the bank stated the following: "Gary, the golf course has contamination on the first hole. This was caused by General Electric. If you go to the EPA web site, GE is listed as a superfund site. No further remediation was needed according to what I can find." Ex. N to GE's Rule 56.1 on State Law Claims [Dkt. 52-2]. Mr. Gehlbach confirmed that he passed the information on to Mr. Beggs. Mr. Beggs did not ask Mr. Gehlbach or anyone else to gather any more information about the environmental condition of the golf course.

Later that same day as Mr. Hooks' e-mail about the contamination on the golf course, Mr. Gehlbach wrote to Mr. Hooks: "Keith, Thanks for the information. Lowell is, as you suggested, anxious to proceed, and after talking further with him, I have revised the Memorandum to reflect this." Ex. O to GE's Rule 56.1 on State Law Claims [Dkt. 52-3]. The bank and Mr. Beggs reached an agreement, and the purchase closed on May 29, 2007. The purchase agreement was drafted by Mr. Gehlbach and contained the following: "[S]eller, however, has disclosed to Purchaser that there is contamination on the first hole of the Real Estate, such contamination having been caused by General Electric, as which contamination is part of the Superfund Site that apparently does not require any further remediation." Ex. Q to GE's Rule 56.1 on State Law Claims [Dkt. 52-5] at 7.

At some time before his purchase, Mr. Beggs walked the entire golf course and noticed that the head of a monitoring well protruded above the ground surface. Later in 2007, after his purchase, Mr. Beggs noticed that the well head had been damaged by equipment used to maintain the course and was leaking water onto the course. Mr. Beggs contacted General Electric to fix it. At the time, Mr. Beggs knew the well monitored "how much stuff was coming out of GE." Beggs Deposition [Dkt. 53-1] at 66.

After purchasing the course, Mr. Beggs used two supply wells on the golf course. It is undisputed that the wells were used for irrigation, but the parties dispute whether maintenance workers also drank water from the north well. As discussed above, an August 2012 test of the water from the north supply well detected a concentration of TCE of 5,000 µg/L, one-thousand times the MCL, while a test of the south well located south of Rock Creek detected a TCE concentration of 0.93 µg/L. After General Electric conducted the well survey required under the IEPA work plan in 2012, it delivered signs to the golf course's groundskeeper to install on the north and south well pumps and spigot that read, "DO NOT DRINK, IRRIGATION WELLS, NON-POTABLE WATER."

The golf course also included a club house. Testing of a "grab" groundwater sample collected next to the clubhouse detected a TCE concentration of 170 µg/L.

In 2012, sampling by General Electric's environmental consultant ARCADIS detected 0.55 micrograms per cubic meter ("µg/m³") of the compound 1,2-DCA in the indoor air at the Beggs/Conway home, above the current residential standard of 0.09 µg/m³. Other chlorinated solvents were also detected in groundwater, soil boring, and soil gas samples taken from near and beneath the Beggs/Conway home, but those samples did not detect 1,2-DCA. However, 1,2-

DCA has been detected elsewhere in soil and groundwater samples at and downgradient from the General Electric plant.[2]

## C. Federal Lawsuit

The plaintiffs filed suit against General Electric on November 1, 2013. They seek a mandatory injunction to require General Electric to remediate the contamination (Count I) under the Resource Conservation and Recovery Act ("RCRA"), *see* 42 U.S.C. § 6972(a)(1)(B); cost recovery (Count II) and a declaratory judgment (Count III) under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), *see* 42 U.S.C. § 9607(a) (cost recovery) and § 9613 (g)(3) (declaratory judgment); and allege state law claims of nuisance (Count IV), trespass (Count V), and negligence (Count VI). Before the Court are three motions for partial summary judgment. First, the plaintiffs seek summary judgment in their favor on Count I for an injunction under RCRA, contending that the undisputed facts establish that the groundwater contamination and vapor intrusion may present an imminent and substantial endangerment. Dkt. 37. Second, General Electric filed a cross-motion for summary judgment on Count I contending that the plaintiffs' claim under RCRA is barred because the IEPA has commenced and is diligently prosecution its own enforcement action. Dkt. 57. Finally, General Electric has filed a motion for summary judgment on the plaintiffs' three state law claims, arguing that the claims are barred by the statute of limitations. Dkt. 48.

## II. ANALYSIS

### 1. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Life Plans, Inc. v. Security Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015). A genuine issue of material fact exists if, when viewing the record and all reasonable inferences drawn from it in the light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Life Plans*, 800 F.3d at 349. The burden to show that no genuine issue of material fact exists falls on the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hotel 71 Mezz Lender LLC v. National Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015). If the movant meets this burden, to survive summary judgment the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

---

[2] In the memorandum in support of their motion for summary judgment, the plaintiffs also assert that vapor intrusion in the home next to theirs is so bad that General Electric installed two sub-slab depressurization systems to prevent chlorinated solvents containing vapors from entering that home. Memorandum [38] at 26 & 35. But they did not include that assertion in their Rule 56.1 statements of fact and so have not established it as an undisputed fact. In any event, according to the ARCADIS report cited in support, 1,2-DCA was detected in the neighbor's indoor air, but not in the sub-slab soil gas. ARCADIS 2014 Report [Rule 56.1, Ex. 19], at 13.

In addition, on the plaintiffs' motion for summary judgment, because the plaintiff bears the burden of persuasion on an issue at trial, it must sustain that burden as well as demonstrate the absence of a genuine issue of material fact. *Hotel 71*, 778 F.3d at 601. Accordingly, a moving party that bears the burden at trial must satisfy both (a) the initial burden of production on the summary judgment motion – by showing that no genuine dispute exists to any material fact – and (b) the ultimate burden of persuasion on the claim – by showing that it would be entitled to a judgment as a matter of law at trial. Schwarzer, *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1991); *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992); *S. Cal Coal Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (moving party that bears burden at trial must establish beyond contention every essential element of claim); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 989 (9th Cir. 2007) (party must demonstrate that no reasonable trier of fact could find for non-movant); 11 *Moore's Federal Practice*, § 56.40[1][c], p. 56-112 (3d ed. 2013). Therefore, in these circumstances, the often-quoted rule of *Celotex Corp. v. Catrett*, with respect to the obligation of the non-moving party that bears the burden of proof at trial is inapplicable. *Reserve Supply Corp.,* 971 F.2d at 42. However, the rule that the court will view the facts in the light most favorable to the non-movant still applies. *Soremekun*, 509 F.3d at 989.

## 2. General Electric's Motion for Summary Judgment on Count I (RCRA)

The Court begins with General Electric's motion for summary judgment on Count I, which is the plaintiff's request for injunctive relief under RCRA. "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483 (1996). Under RCRA, "any person may commence a civil action on his own behalf . . . against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Upon such a showing, a district court may "restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (l)(B), to order such person to take such other action as may be necessary, or both ...." 42 U.S.C. § 6972(a); *Meghrig*, 516 U.S. at 484. The statute entitles these actions "[c]itizen suits." 42 U.S.C. § 6972.

However, "[n]o action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment . . . *has commenced and is diligently prosecuting* an action *under subsection (a)(1)(B) of this section*." 42 U.S.C. § 6972(b)(2)(C)(i) (emphasis added).

In its motion for summary judgment on Count I, General Electric contends that because the Illinois Attorney General already commenced suit against it in state court in 2004, and has diligently prosecuted the suit since, § 6972(b)(2)(C)(i) prohibits the plaintiff from commencing a citizen suit. The plaintiffs respond that under § 6972(b)(2)(C)(i), only a state's prior suit brought under § 6972(a)(1)(B) of RCRA may serve to bar a later-filed citizens suit, and therefore Illinois' suit alleging claims under its own Environmental Protection Act rather than RCRA does not serve to bar their citizen suit. Moreover, the plaintiffs contend the State has not diligently

prosecuted the case as evidenced by the fact that in the eleven years since it sued and 29 years after contamination was first discovered, it "has done nothing to compel GE to actively remediate its contamination." Response [Dkt. 68] at 14.

To determine the scope of the bar set out in § 6972(b)(2)(C)(i), the Court looks first to the plain meaning of the language of the statute. *KM Enterprises, Inc. v. Global Traffic Technologies, Inc.*, 725 F.3d 718, 728 (7th Cir. 2013). If the language at issue has a plain and unambiguous meaning, then that meaning controls. *Id.* (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). Section 6972(b)(2)(C)(i) bars the commencement of a citizen suit under RCRA only where the state "has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section." Thus, under the plain meaning of the terms used, only a suit brought by the State under the "imminent and substantial endangerment to health or the environment" provision of RCRA can serve to bar a citizen suit. *See* 42 U.S.C. § 6972(a)(1)(B).

But General Electric contends that even a State's suit under state law bars a citizen suit if the state law was implemented "in lieu of" RCRA. General Electric notes that 42 U.S.C. § 6926(b) allows the U.S. EPA to authorize a state to implement its own hazardous waste program "in lieu of the Federal program," and that Illinois has received authorization. 51 Fed. Reg. 3778 (Jan. 31, 1986) (authorizing Illinois to operate its own hazardous waste program).

General Electric has cited no authority directly holding that a suit brought under a State program operated in lieu of RCRA triggers the bar under 42 U.S.C. § 6972(b)(2)(C)(i) for citizen suits brought under subsection § 6972 (a)(1)(B). Moreover, General Electric's argument is not supported by the statutory language. RCRA allows the U.S. EPA to authorize states to implement a hazardous waste program "in lieu of the Federal program *under this subchapter*" of RCRA, which is subchapter 3 entitled "Hazardous Waste Management." 42 U.S.C. § 6926(b) (emphasis added). The "imminent and substantial endangerment" provision of 42 U.S.C. § 6972(a)(1)(B) appears in an entirely different subchapter of RCRA; namely, subchapter 7 which is entitled "Miscellaneous Provisions." Because § 6926(b) gave the U.S. EPA the power to authorize states to implement programs only in lieu of subchapter 3, not subchapter 7, the U.S. EPA did not authorize Illinois to implement a program in lieu of § 6972(a)(1)(B). Therefore, General Electric has not established that the IEPA's suit under state laws acting in lieu of subchapter 3 is the equivalent of a suit brought under subchapter 7's § 6972(a)(1)(B).

Nevertheless, General Electric contends that if the claims and relief sought in a citizen suit are similar to the claims and relief sought in a State's earlier-filed suit, the citizen suit is barred even if the earlier suit was not brought under § 6972(a)(1)(B). General Electric contends that the plaintiffs' suit is similar to Illinois' suit because the IEPA first issued a § 4(q) notice alleging an "immediate and significant risk of harm to human health and the environment," and then sought a permanent injunction, just like the plaintiffs allege and seek here. *See* GE Supplemental Statement [85] at 2. In support, General Electric relies on *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 494 (7th Cir. 2011), for the proposition that "to the extent that the plaintiffs' RCRA claims overlap with the claims [the state] asserted in its first suit . . . they cannot be pursued in this citizen action because of 42 U.S.C. § 6972(b)(1)(B)." But what General Electric does not address is that *Adkins* involved a citizen suit under 42 U.S.C. § 6972(a)(1)(A), which allows citizens to file suit based on the "violation of any permit,

standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter," as opposed to § 6972(a)(1)(B) suits based on "waste which may present an imminent and substantial endangerment to health or the environment." The circumstances under which a § 6972(a)(1)(A) citizen suit is barred is far broader than for a § 6972(a)(1)(B) citizen suit. *Compare* 42 U.S.C. § 6972(b)(1)(B) (applicable to (a)(1)(A) citizen suits) *with* 42 U.S.C. § 6972(b)(2)(C) (applicable to (a)(1)(B) citizen suits). Notably, citizen suits under § 6972(a)(1)(A) are potentially barred by a prior suit by the Administrator or the State to require compliance with any "permit, standard, regulation, condition, requirement, prohibition, or order" under RCRA. *See* 42 USC § 6972(b)(1)(B). This is in stark contrast to citizen suits under § 6972(a)(1)(B), which are potentially barred only by a prior suit by the State under RCRA's § 6972(a)(1)(B) (or certain provisions of CERCLA not relevant here). *See* 42 USC § 6972(b)(1)(C). *Adkins* addresses only the restrictions on citizen suits under § 6972(a)(1)(A), and therefore provides no basis for setting aside the plain meaning of the far different restrictions on citizen suits under § 6972(a)(1)(B).

Even if the Court were to look beyond the plain meaning of the relevant statutory provisions, General Electric still fails to find support for its assertion that claims under state laws implemented in lieu of subchapter 3 of RCRA are equivalent to claims under § 6972(a)(1)(B) found in subchapter 7. General Electric relies on *Hudson Riverkeeper Fund, Inc. v. Harbor at Hastings Assocs.*, 917 F. Supp. 251 (S.D.N.Y. 1996), in which the court determined that an earlier lawsuit by the state that did not specifically allege a claim under § 6972(a)(1)(B) nevertheless barred a later-filed citizen suit. *Id.* at 256. Because the state's earlier complaint was "silent as to what law they were brought under," the court determined that under New York's unique pleading standard, "all cases brought in the New York Supreme Court are as a matter of law brought under all applicable federal statutory provisions applicable by their terms to the 'occurrence or transaction' sued on, except where Congress has reserved exclusive jurisdiction to a federal court." *Id.* Based on that unique pleading standard, the *Hudson Riverkeeper* court found that "the pending State Court action is the equivalent of one brought under the RCRA," including § 6972(a)(1)(B). *Id.* 255 ("it is impossible to say that any lawsuit arising out of an occurrence which implicates the RCRA is *not* being brought pursuant to that statute"), 256 ("Once it is determined that the pending action by New York State qualifies under section (b)(1)(B) of the statute of [sic] this Court concludes that it does, it must then be shown that the state has been diligently prosecuting the action for it to act as a bar to citizen's suits."). Therefore, *Hudson Riverkeeper* is distinguishable because here the State of Illinois, through the Illinois Attorney General and IEPA, specifically identified the Illinois Environmental Protection Act as the basis of its claims.

Moreover, a decision by another court within this district specifically rejected the argument General Electric asserts here. *Mejdreck v. Lockformer Co.*, No. 01 CV 6107, 2002 U.S. Dist. LEXIS 14785 (N.D. Ill. Aug. 12, 2002), involved a citizen suit brought after the State filed an earlier lawsuit alleging violations of only state environmental laws. The defendant sought to dismiss the citizen suit because "the goal of avoiding duplicitous suits can only be met if citizens' suits are preempted by state suits seeking the same relief." *Id.* at *30. Like General Electric here, the defendants in *Mejdreck* cited *Hudson Riverkeeper* to support their argument. But the court in *Mejdreck* rejected the argument because it was contrary to the language of the statute: ". . . the IEPA specifically brought its case under the Illinois Environmental Protection

Act.  Therefore, there is no ambiguity the Court needs to resolve and the Court finds that *Hudson* is not persuasive to overlook the plain language of the RCRA."  *Id.* at *31.  *See also Northern California River Watch v. Humboldt Petroleum, Inc.*, No. 00 CV 1329, 2000 U.S. Dist. LEXIS 15939, at *7 (N.D. Calif. Oct. 30, 2000) ("only an action by the state under RCRA subsection (a)(1)(B) itself will bar a private suit" under § 6972(a)(1)(B), rejecting defendant's argument that earlier-filed state law actions were "the equivalent of RCRA actions").

General Electric argues that *Mejdreck* is inapplicable because it does not address that Illinois was authorized to implement its own hazardous waste program in lieu of RCRA, and because no other case has followed *Mejdreck*.  However, at the same time, General Electric has cited no case rejecting *Mejdreck*, and General Electric has cited no authority holding that suits under the Illinois Environmental Protection Act fall under the bar set out in § 6972(b)(2)(C)(i).  General Electric cites to *Acme Printing Ink Co. v. Menard, Inc.*, 881 F. Supp. 1237, 1244 (E.D. Wisc. 1995), for the proposition that "the diligent prosecution bar in RCRA equally ensures that a civil suit filed in state court by a state agency which is authorized to administer the RCRA program as the primary enforcement authority prohibits citizen suits which overlap seeking the same relief in a parallel proceeding."  Reply [71] at 3.  But *Acme Printing* involved a proposed citizen suit to restrain ongoing violations under § 6972(a)(1)(A), which, as detailed above, is not subject to the same bar as suits under § 6972(a)(1)(B), and therefore the case is inapplicable.

 General Electric also notes that *Mejdreck* predates *Adkins v. VIM Recycling, Inc.*  According to General Electric, in *Adkins*, the Seventh Circuit "acknowledged that an earlier-filed state action (in state court, under state law and not under RCRA) may preempt a later-filed citizen suit under § 6972(b)(2)(C)(i)."  Reply [71] at 5.  But, as with *Acme* and as discussed earlier, *Adkins* focuses on the bar found in § 6972(b)(2)(B) involving claims under § 6972(a)(1)(A), and did not decide whether a prior suit under state law could be the equivalent of a claim under § 6972(a)(1)(B).  Although it did refer to citizen suits under § 6972(a)(1)(B) and when they might be barred under § 6972(b)(2)(C)(i), it merely noted ---in a footnote, no less--- only that the parties had not argued equivalency:  "Although the district court found that section 6972(b)(2)(C)(i) could operate as a bar if the State had commenced its own RCRA 'endangerment' action, the parties failed to address whether IDEM's suits could constitute such an action 'under' RCRA. . . VIM has not renewed on appeal any argument it may have that the plaintiffs' 'endangerment' claim was statutorily preempted under section 692(b)(2)(B) or (b)(2)(C)."  *Adkins*, 644 F.3d at 491 n.2.  Additionally, even if the *Adkins* court addressed the correct statutory section, it did not address the issue.  Instead, the *Adkins* court ducked the issue.  And questions that lurk in the record, but that are not ruled upon by a court, do not constitute precedent.  *Webster v. Fall*, 266 U.S. 507, 511 (1925); *see also United States v. L.A. Truck Lines, Inc.*, 344 U.S. 33, 37-38 (1952) (an opinion creates no precedent on points not argued or discussed); *United States v. Torres*, No. 14-1538, 2015 U.S. App. LEXIS 20908, at *11 (7th Cir. Dec. 2, 2015) (caselaw cited to support an issue is unhelpful where the court "explicitly avoided" the issue).  Accordingly, *Mejdreck* is not at odds with *Adkins*.

General Electric also relies on two cases in which courts noted that a citizen suit under RCRA was not barred because the State had not filed an earlier enforcement action in court, either federal or state.  *See Chico Service Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 35 (1st Cir. 2011) ("Because the EQB has not filed an enforcement action in state or federal court,

we hold that Chico's citizen suit is not subject to dismissal pursuant to the diligent prosecution bar."); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618 (7th Cir. 1998) ("We are mindful that a citizen's (that is, that PMC's) suit under RCRA is barred if the state at the time of suit 'has commenced and is diligently prosecution an action' in a federal or state court under the statute to clean up the site."). According to General Electric, because a claim under § 6972(a)(1)(B) may be filed only in federal court, the only reason for these courts to have mentioned state court was if suits based on state law could be considered the equivalent of suits under RCRA. But the issue in those cases was whether the earlier enforcement action was an administrative proceeding rather than a lawsuit, as only a prior lawsuit (as opposed to administrative proceeding) can serve as a bar. *See Chico*, 633 F.3d at 35; *PMC*, 151 F.3d at 618-19. The cases did not decide that a state suit based on a state law standing in lieu of RCRA was the equivalent of a suit based on § 6972(a)(1)(B) itself.

During the argument on the cross motions for summary judgment, General Electric's counsel made a powerful argument that this Court should not interfere with a matter that is pending in state court. Counsel cited to several valid policy concerns that arise when a federal court interferes with ongoing matters that are being litigated in state court; concerns that this Court shares. However, importantly, Congress disagrees with General Electric's position. And Congress' express views trump this Court's concerns. The clear language of RCRA evidences Congress' belief that multiple enforcers of RCRA should exist: the U.S. EPA, the States, and private citizens. But in expressing its belief, Congress carefully balanced how, when and under what circumstances citizens can enter the fray and avail themselves of the equitable power of the federal courts. When those Congressional mandates are satisfied, citizens can file suit even when a state court has already undertaken the matter. The clear language of RCRA establishes the intentional Congressional policy decision that this Court cannot ignore.

In summary, General Electric has presented no authority persuasive enough to overcome the plain language of RCRA. Specifically, § 6972(b)(2)(C)(i) applies only to actions commenced and diligently prosecuted "under subsection (a)(1)(B) of this section." Because the State of Illinois sued only under the Illinois Environmental Protection Act and not under § 6972(a)(1)(B) of RCRA, General Electric's motion for summary judgment on Count I is denied.[3]

### 3. Plaintiffs' Motion for Summary Judgment on Count I (RCRA)

Having determined that the plaintiffs' claim under RCRA is not barred, the Court now turns to the plaintiffs' motion for summary judgment on their RCRA claim. The primary purpose of RCRA is to limit the harmful effects of hazardous waste "to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). Under 42 U.S.C. § 6972(a)(1)(B), a court "may restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" and "to order such person to take such other action as may be necessary" where the waste "may present an imminent and substantial endangerment to health or the environment." To succeed, a plaintiff must establish each of the following: "(1) that the

---

[3] Because the Court finds §6972(a)(1)(B) was not the basis for the State's suit, the Court need not address whether the State is diligently prosecuting its case.

defendant has generated solid or hazardous waste, (2) that the defendant is contributing to or has contributed to the handling of this waste, and (3) that this waste may present an imminent and substantial danger to health or the environment." *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002). General Electric does not dispute that the plaintiffs can establish the first two elements. Therefore, the Court focuses on the third element: whether the undisputed facts establish that the contaminants may present an imminent and substantial endangerment to health or the environment.

When interpreting the phrase "may present an imminent and substantial endangerment," courts have found that the operative word is "may," and that its presence requires an expansive interpretation of the entire phrase. *Forest Park Nat'l Bank & Trust v. Ditchfield*, 851 F. Supp. 2d 949, 976 (N.D. Ill. 2012) ("Though the Seventh Circuit has yet to comment on the significance of 'may,' several other circuits have construed § 6972(a)(1)(B) broadly, in large part, because of the use of the word 'may.'"); *Interfaith Community Organization v. Honeywell Int'l, Inc.*, 399 F.3d 248, 258 (3rd Cir. 2005) (citing *Parker v. Scrap Metal Processors*, 386 F.3d 993, 1015 (11th Cir. 2004)). They find support for a broad interpretation in Congress' decision in 1980 to extend the reach of RCRA by substituting the words "may present" for "is presenting." Solid Waste Disposal Act Amendments of 1980, Pub. L. No. 96-482, § 25, 94 Stat. 2334, 2348 (1980); *Maine People's Alliance & Natural Resources Defense Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 287 (1st Cir. 2007).

In that spirit, courts have construed "may present" as requiring plaintiffs to show only the potential for an imminent and substantial endangerment. *Interfaith Community*, 399 F.3d at 258. Likewise "imminent" is not limited to an "existing harm, only an ongoing threat of future harm." *Albany Bank*, 310 F.3d at 972; *see also Maine People's*, 471 F.3d at 287-88 ("generally has been read to require only that the harm is of a kind that poses a near-term threat; there is no corollary requirement that the harm necessarily will occur or that the actual damage will manifest itself immediately.") (citing *Cox v. City of Dallas*, 256 F.3d 281, 299-300 (5th Cir. 2001)). Thus, a threat is imminent if the endangerment exists now, even though the harm may not be felt until later. *Meghrig*, 516 U.S. at 486. As for "substantial," courts have construed that word to mean serious, as opposed to any certain minimum quantification of the endangerment. *Grace Christian Fellowship v. KJG Investments, Inc.*, No. 07 CV 348, 2009 U.S. Dist. LEXIS 76954, at *16 (E.D. Wisc. Aug. 7, 2009); *Interfaith Community*, 399 F.3d at 259.

However, "there is a limit to how far the tentativeness of the word *may* can carry a plaintiff." *Crandall v. Denver*, 594 F.3d 1231, 1238 (10th Cir. 2010) (emphasis in original). An endangerment must be more than merely possible. *Id.* In addition, a plaintiff cannot prevail based solely on evidence that a contaminant is present, but rather must show that its presence may present an imminent and substantial endangerment. *Birch Corp. v. Nevada Investment Holding, Inc.*, No. 97-55282, 1998 U.S. App. LEXIS 14923, at **9-10 (9th Cir. June 29, 1998) (where groundwater was nonpotable anyway and where the contamination plume was stabilized and levels were dropping, the contamination did not present an imminent threat to either health or the environment).

The plaintiffs assert that the undisputed evidence establishes that an imminent and substantial endangerment may be present in the area around the General Electric plant including at the golf course and their home. In support, they identify the following undisputed evidence:

- chlorinated solvents were released at the General Electric plant and since at least 1986 have been detected in the groundwater;

- the contamination forced the City of Morrison to remove two municipal wells from serving as sources of drinking water, and the city continues to use an air scrubber to eliminate contaminants from drinking water from the remaining municipal well;

- contaminated groundwater has migrated from the plant to areas south of the plant including the Prairie Ridge Golf Course;

- the chlorinated solvents in the contaminated groundwater have been detected at levels far exceeding the MCL, sometimes at levels more than one-thousand times the MCL;

- although GeoTrans reported in 2001 that contamination levels were dropping and would naturally attenuate to levels below the MCL, tests in 2012 detected levels far in excess of the MCL in wells south of the plant including: up to 2,700 µg/L in MW7-LS, 4,800 µg/L in MW8-LS, and 5,000 µg/L in the golf course's north supply well;

- though at a level below the MCL, chlorinated solvents have been detected in one well south of Rock Creek, despite GeoTrans' finding that Rock Creek was a natural barrier;

- Morrison city ordinances prohibiting the use of wells for drinking water will not protect against the use of groundwater for drinking outside the city limits;

- the chlorinated solvent 1,2-DCA was detected inside the plaintiffs' home; and

- General Electric installed a vapor control system in the home next to the plaintiffs'.

According to the plaintiffs, these undisputed facts establish that the contamination originating from the General Electric plant is "uncontrolled, unabated, undefined and unaddressed." Memorandum [Dkt. 38] at 34. And the plaintiffs argue that even after 30 years since the contamination first came to light, followed by all of the environmental consultants hired and studies performed, General Electric has still not yet determined: (1) the vertical extent of contamination; (2) the southern boundary of contamination; or (3) whether the solvents continue to feed the plume.

In response, General Electric argues that the evidence does not establish that the contamination may present an imminent and substantial endangerment for three reasons. First, General Electric contends that all pathways to human exposure have been eliminated. Specifically, General Electric contends that (1) the City of Morrison shut down two of the three contaminated municipal wells used for drinking water, and uses an air scrubber to remove the contaminants from water obtained from the remaining well, (2) the city enacted two ordinances to prohibit the use of private wells for potable water and from drilling new wells, (3) the contaminated wells on the golf course are used only for irrigation, and (4) signs warn users not to drink water from the golf course wells.

General Electric argues that because all pathways to human exposure have been eliminated, the evidence does not establish that the contaminated groundwater may present an imminent and substantial endangerment. It purports to find support in decisions in which evidence that humans were not drinking from contaminated groundwater led courts to conclude that no threats of an imminent and substantial endangerment existed. For instance, in *Scotchtown Holdings LLC v. Goshen*, No. 08 CV 4720, 2009 U.S. Dist. LEXIS 1656 (S.D.N.Y. Jan. 5, 2009), the plaintiff sued under RCRA to enjoin the defendant, whose use of road salt had contaminated the groundwater beneath a site, rendering the groundwater undrinkable and prevented the site's redevelopment for residential housing. The court dismissed the complaint because the plaintiff had failed to "allege any deleterious effects that the sodium chloride has had or may have on health or the environment other than preventing the development of the Site." *Id.* at *7. *Scotchtown* is thus distinguishable for two reasons. First, the court found that the contaminant---salt---was deleterious only to plans to develop the site, not to humans or the environment. *Id.* Second, the site was uninhabitated, and there was no evidence that the contamination was migrating anywhere else, as opposed to the contamination at issue here, which is moving under residential and recreational sites within Morrison.

General Electric also relies on *Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 432 (M.D. Penn. 2000), in which the court granted the defendant's motion for summary judgment on the plaintiff's RCRA claim because "[t]he fact that no one is drinking this water eliminated it as a threat to health or the environment." *Id.* at 446. However, in *Two Rivers* the nearby groundwater was unusable for drinking not solely because of the petroleum and BTEX hydrocarbons contaminating it but because of a preexisting high iron content. *Id.* at 445. In addition, the contaminants were flowing away from off-site drinking wells. *Id.*

Two other cases on which General Electric relies for this point are likewise distinguishable. *In Avondale Federal Savings Bank v. Amoco Oil Co.*, 170 F.3d 692 (7th Cir. 1999), the Seventh Circuit affirmed the district court's entry of summary judgment for the defendant on the basis that gasoline that had leaked from an underground storage tank did not present an imminent and substantial endangerment. But in *Avondale*, the defendant had already remediated the site, obtained a "No Further Remediation" letter from the IEPA, and the plaintiff's own expert had testified that the contaminants would present a threat only if a nearby street was ever excavated. *Id.* at 693, 695. Likewise, in *Foster v. United States*, 922 F. Supp. 642 (D.D.C. 1996), the court granted summary judgment to the defendant because asphalt paving covered the contaminated site, there was no evidence that the contaminated groundwater was

migrating or percolating through the soil, or had been used for drinking or any other purpose. *Id.* at 662.

The contamination that was found not to present an imminent and substantial endangerment in General Electric's cases stands in contrast to the contamination at issue here. It is undisputed that the groundwater contaminated by General Electric's plant has been moving under residential and recreational sites, and has demonstrated its deleterious reach by contaminating municipal wells that had been used for drinking water. In addition, a contaminated well on the golf course continues to this day to be used for irrigation. Moreover, no remediation has yet occurred, and although General Electric tried to rely on natural attenuation to solve the contamination, the contaminated groundwater continues to migrate with no sign that it has stopped. To the contrary, although chlorinated solvent levels in the well south of Rock Creek do not presently exceed the MCL, their detection indicates that the plume *may* have crossed the creek despite GeoTrans' assertion that the creek allegedly acted as a natural barrier.

Thus, the contamination here is more akin to that in *Fairway Shoppes v. Dryclean USA*, No. 95 CV 8521, 1996 U.S. Dist. LEXIS 22364 (S.D. Fla. Mar. 7, 1996) and *Lincoln Properties v. Higgins*, 91 CV 760, 1993 U.S. Dist. LEXIS 1251 (E.D. Calif. Jan. 18, 1993), where district courts found that evidence that groundwater contaminated with the chlorinated solvent Perc was migrating toward populated areas, and had or may reach wells from which the groundwater was used for drinking, established or was likely to establish that the contamination may present a substantial and imminent endangerment to health. In *Lincoln Properties*, the court partially reached its conclusion based on that fact that, as here, the contamination had already forced the removal from service and the destruction of four municipal wells. *Lincoln Properties*, 1993 U.S. Dist. LEXIS 1251, at *48 (granting plaintiff's motion for summary judgment). In *Fairway Shoppes*, the court found that the migration of contaminants towards a residential development and the threat that they may reach potable water supplies "unquestionably meets the 'imminent and substantial endangerment' standard of RCRA. The Court need not—and should not—wait until the contaminated water is actually detected in public water supply wells before taking action." *Fairway Shoppes*, 1996 U.S. Dist. LEXIS 22364, at **22-23 (granting plaintiff's motion for a preliminary injunction). The *Fairway Shoppes* court found that the contamination was an imminent and substantial endangerment not only to health but also the environment for the independent reason that it had entered the soil and groundwater *See also Voggenthaler v. Maryland Square*, No. 08 CV 1618, 2010 U.S. Dist. LEXIS 74217, **41-42 (D. Nev. July 22, 2010) (granting plaintiff's motion for summary judgment where contaminated plume continued to migrate toward residential properties even though wells in the plume's path were not currently used for drinking water), *rev'd in part on other grounds* 724 F.3d 1050 (9th Cir. 2013).

For similar reasons, the cases which General Electric cites for the proposition that the mere presence of contaminants is insufficient under RCRA are also distinguishable. For instance, in *Birch Corp. v. Nevada Investment Holding, Inc.*, the court held that the mere presence of contaminants did not present an imminent and substantial threat because the plume was stabilized, contamination levels were dropping, and the threatened groundwater was nonpotable anyway. *Birch*, 1998 U.S. App. LEXIS 14923, at **9-10. In contrast, the plume from the General Electric plant is migrating under residential areas downgradient from the plant

where levels have risen over time, some to thousands of times the MCL. In another case General Electric cited to support its mere presence argument, *Leister v. Black & Decker*, No. 96-1751, 1997 U.S. App. LEXIS 16961, at *9 (4th Cir. July 8, 1997), the court held that the contaminants that remained after a fully-implemented remediation plan did not present an imminent and substantial endangerment because the evidence suggested that the remaining contaminants were no longer a threat to health or the environment. In contrast, the contaminants from the General Electric plant have not yet been remediated, remain at levels far in excess of the MCL, and continue to migrate.

General Electric contends that because the City of Morrison's wells have already been removed from service and city ordinances prohibit the use of any other wells for drinking, the contaminated groundwater no longer meets the "may present a substantial and imminent threat" standard. But the court in *Forest Park National Bank & Trust v. Ditchfield*, 881 F. Supp. 2d at 976, rejected as "twisted" a similar argument offered by a defendant in support of its motion to dismiss. The defendant argued that a threat was not imminent where environmental reports recommended that a building remain vacant because of contaminated air vapors. The court rejected the defendant's argument: "Whether a threat is 'imminent' cannot turn on whether the allegedly contaminated residence is currently occupied; by that twisted rationale, the owner of any property rendered uninhabitable by extreme contamination could not bring a § 6972(a)(1)(B) claim based on an imminent threat to health." *Id.* Likewise, General Electric cannot establish lack of imminence based on the fact that contamination from its plant was so extreme that all of Morrison is prohibited from using wells for drinking water. Unlike the situation in the cases offered by General Electric and discussed above, the contamination from the plant is the sole---and undisputed---reason that Morrison's groundwater is no longer potable.

The court notes that General Electric focuses only on the threat to humans even though RCRA also addresses contaminants that "may present an imminent and substantial endangerment to health *or the environment*." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). Thus, in cases such as *Interfaith Community v. Honeywell Int'l*, 399 F.3d at 262, the court granted the plaintiff's motion for summary judgment based on evidence that a contaminated river threatened not only humans but also the environment where the evidence showed that the area was home to dogs, birds, and fish, and that the mortality rate for organisms living in the river's sediment was 50 to 100 percent. *See also Fairway Shoppes Joint Venture*, 1996 U.S. Dist. LEXIS 22364, at *22 (although wells towards which contamination was migrating "are apparently used for irrigation, and not for potable water supply, the drawdown effect of these wells may result in further spreading of the contamination into the development" and thus may present a threat to the environment). Although the plaintiffs have identified undisputed evidence that groundwater used to irrigate the golf course is contaminated, they have not identified if or how that constitutes a threat to plants or wildlife and, therefore, could not prevail at this stage based solely on endangerment to the environment. However, as discussed above, they have presented sufficient evidence to establish liability under RCRA based on endangerment to health.

In short, although General Electric purports to find support in cases where contamination fell short of the substantial and imminent standard, those cases are distinguishable because the contamination was not spreading, had already been remediated, or was not threatening residential areas. In contrast, in Morrison, chlorinated solvents have been migrating for nearly 30 years and

continue to contaminate the groundwater at levels up to one-thousand times the MCL; the contamination has already forced the removal of municipal wells from service, and continues to contaminate a well still used for irrigation. The plant may also be the source of contamination detected south of Rock Creek, despite GeoTrans' finding that Rock Creek was a natural barrier. Therefore, the extensive contamination in Morrison satisfies the plain meaning of the language of RCRA as waste that may present an imminent and substantial threat to health or the environment.

Second, General Electric argues that disputed questions of fact preclude the entry of summary judgment on the portion of the plaintiffs' RCRA claim premised on contaminated air vapors in the home of Lowell Beggs and Martha Kai Conway. The plaintiffs contend that 0.55 $\mu g/m^3$ of the compound 1,2-DCA was detected in the indoor air at the Beggs/Conway home, above the current residential standard of 0.09 $\mu g/m^3$, citing in support the May 2014 report by ARCADIS. The plaintiffs contend that because other undisputed evidence shows that 1,2-DCA was also detected in soil and groundwater samples at the General Electric plant and downgradient from the plant, it follows that General Electric is also responsible for the air contamination in their home. In response, General Electric points to evidence to create a genuine question of fact over whether the air vapor contaminants originated from its plant. Specifically, it cites to the same ARCADIS report that 1,2-DCA was not detected in soil vapor testing beneath the Beggs/Conway home and was not detected in shallow groundwater nearby the home, facts the plaintiffs do not dispute. Thus, although there is no dispute over where and at what levels 1,2-DCA was detected, the parties do dispute whether the 1,2-DCA detected at the Beggs/Conway home originated at the General Electric plant. General Electric contends that the lack of 1,2-DCA in the soil under the home or in shallow groundwater upgradient and within 100 feet of the Beggs/Conway home creates a gap in evidence of a direct pathway from the plant to the home. General Electric notes that the ARCADIS report speculates that the 1,2-DCA that was detected may have originated from within the home from pesticides, upholstery cleaners, synthetic resins, rubber adhesive, or even off-gassing holiday ornaments. It argues that without evidence of a direct pathway of contamination into the Beggs/Conway home, the plaintiffs cannot establish that there may be an imminent and substantial endangerment based on the detection of 1,2-DCA.

In *Price v. United States Navy*, 39 F.3d 1011, 1020 (9th Cir. 1994), the court held that speculation, rather than any evidence, that contaminants lurked under a foundation did not establish a pathway for contaminants into a residential home, and therefore did not establish a threat of imminent and substantial endangerment. Similarly in *Grace Christian Fellowship v. KJG Investments, Inc.*, 2009 U.S. Dist. LEXIS 76954, at *27, the court found no threat of imminent and substantial endangerment in the absence of evidence of a pathway through which compounds under a building's concrete slab were migrating into the basement air. General Electric argues that because of the absence of evidence of 1,2-DCA under the plaintiffs' home, they too cannot establish a pathway of contamination, and therefore have not shown that the contamination may present an imminent and substantial threat.

However, even assuming a lack of a direct pathway into the air inside the Beggs/Conway home, as discussed above, the plaintiffs have still shown that an imminent and substantial threat may be presented by the contaminated groundwater migrating from the General Electric plant

into the surrounding area including municipal wells, residential areas, and the area under the golf course. Whether those contaminants have reached inside residential homes may impact the scope of any injunctive relief, but at this juncture any lack of a direct pathway into the homes does not undermine the Court's previous determination that General Electric's contaminants may present an imminent and substantial threat based on the presence in migrating groundwater.

The Court briefly addresses one other issue General Electric raised in opposition to the plaintiffs' motion. General Electric contends the relief the plaintiffs seek is moot because the Consent Order the state court entered in 2010 already obligates General Electric "to perform the investigation and remediation activities necessary to address the onsite and offsite soil and groundwater contamination." Reply [71] at 13. But the Consent Order requires remediation only after the adoption of a Remedial Action Plan, which is not due until after adoption of a Remedial Objectives Report, stages the state court proceeding has not yet reached and, in fact, General Electric has not identified any remediation that has occurred. In contrast, in the cases General Electric cites, the relief the plaintiffs sought was moot because the defendants' remediation efforts were already underway. *See, e.g.*, *West Coast Home Builders, Inc. v. Aventis Cropscience USA Inc.*, No. 04 CV 2225, 2009 U.S. Dist. LEXIS 74460, at *15 (N.D. Calif. Aug. 21, 2009) ("remediation has been underway for years.")

Having established that the contaminated groundwater may present an imminent and substantial endangerment, the plaintiffs have established liability under RCRA. The court therefore proceeds to the relief sought, which is the plaintiffs' request for injunctive relief. In addition to liability, the plaintiffs must also satisfy the traditional elements of injunctive relief even where the statute specifically authorizes that type of relief. *United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987)). Thus, the plaintiffs must also show (1) an irreparable injury, (2) an inadequate remedy at law, (3) the balance of hardships weighs in favor of an injunction, and (4) the public interest would not be disserved by a permanent injunction. *Maine People's Alliance*, 471 F.3d at 296.

The parties have not focused on these factors and, in fact, the plaintiffs have asked the court to defer a decision on the scope of an injunction until after further proceedings. Memorandum [38] at 37-38. Bifurcating the determination of liability from the determination of the ultimate injunctive remedy is supported by the approach taken by other courts. In *Voggenthaler*, 2010 U.S. Dist. LEXIS 74217, *44 (D. Nev. July 22, 2010), the district court granted the plaintiff's motion for summary judgment as to liability under RCRA, but saved the determination of precise terms of injunctive relief until after further hearing. The First Circuit affirmed a similar approach in *Maine People's Alliance*, 471 F.3d at 282, 296-97, in which after a bench trial the district court determined liability and enjoined the parties to attempt to agree on a study, before devising a feasible remediation plan.

Because the plaintiffs have sought summary judgment only as to liability under RCRA, and because the parties have confined their presentation of evidence and argument to issues of liability rather than whether injunctive relief is available and, if so, its scope, this Court will defer until later the parameters of any injunctive relief as to Count I. The Court notes that in their opening brief the plaintiffs also ask for leave to file a petition for fees as the prevailing

parties and to assess a fine against General Electric.  But General Electric never responded to those issues and they did not come up again in the parties' briefs.  Without a full presentation of the issues of fees and fines, the Court likewise defers any decision on those issues.

### 4. General Electric's Motion for Summary Judgment on Counts IV – VI (State Law Claims)

Finally, General Electric seeks summary judgment on the plaintiffs' state law claims of nuisance (Count IV), trespass (Count V), and negligence (Count VI).  General Electric contends that the plaintiffs' claims are untimely because they were filed more than five years after plaintiff Lowell Beggs knew about the contamination on the golf course that serves as the basis for his claims.  The plaintiffs respond that their state law claims are not untimely because they are based on continuing torts and, therefore, the statute of limitations has not yet run.  Alternatively, they argue that General Electric is equitably estopped from asserting the statute of limitations defense because it has allegedly concealed the extent and significance of the contamination on and around its plant.

#### a. Discovery Rule & Continuing Tort Doctrine

Under Illinois law, tort claims for damage to property are timely if made within five years after the cause of action accrues.  735 ILCS 5/13-205.  The cause of action in tort accrues when the injury occurs.  *State Farm Fire & Cas. Co. v. John J. Rickhoff Sheet Metal Co.*, 914 N.E.2d 577, 593 (1st Dist. 2009).  However, under the discovery rule the accrual date is tolled until "'the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved.'"  *In re marchFirst, Inc.*, 589 F.3d 901, 903-04 (7th Cir. 2009) (quoting *Superior Bank FSB v. Golding*, 605 N.E.2d 514, 518 (Ill. 1992)).

General Electric contends that it is undisputed that the plaintiffs had sufficient information about the contamination in and around the golf course at least by the time Mr. Beggs purchased the course on May 29, 2007.  In support, General Electric notes that seller Citizens First Bank alerted Mr. Beggs to the contamination when bank representative Keith Hooks e-mailed Mr. Beggs' attorney Gary Gehlbach:  "Gary, the golf course has contamination on the first hole.  This was caused by General Electric.  If you go to the EPA web site, GE is listed as a superfund site.  No further remediation was needed according to what I can find."  Ex. N to GE's Rule 56.1 on State Law Claims [Dkt. 52-2].

Mr. Gehlbach passed the information on to Mr. Beggs, but neither made any further inquiries.  Rather, that same day Mr. Gehlbach confirmed to Mr. Hooks that Mr. Beggs intended to proceed with the purchase, and included in the sale contract the representation that:  "[S]eller, however, has disclosed to Purchaser that there is contamination on the first hole of the Real Estate, such contamination having been caused by General Electric, as which contamination is part of the Superfund Site that apparently does not require any further remediation."  Ex. Q to GE's Rule 56.1 on State Law Claims [Dkt. 52-5].

Mr. Beggs also testified that before the purchase, he noticed the head of a monitoring well protruding above the surface of the golf course. He testified that later in 2007, when he noticed that the well head had been damaged and was leaking, he knew the well was for monitoring contaminants from the General Electric plant, and contacted General Electric to fix it.

General Electric notes that it is also undisputed that by the May 29, 2007, sale of the golf course, the results of numerous tests revealing the presence of chlorinated solvents in excess of the MCL had been filed with the IEPA. For instance, it notes that in August 2001, Harrington Engineering filed a letter report with the IEPA summarizing years of testing results as well as a map identifying the location of the wells tested, which included wells on the golf course. Harrington Engineering's comprehensive letter report filed with the IEPA in April 2007 also detailed test results from 2005 and 2006, revealing the presence of solvents in excess of the MCL. Although General Electric contends that the information filed with the IEPA was available in the public record, neither party has developed any evidentiary record of how the plaintiffs could have accessed the information. But the burden of establishing facts to avail itself of the discovery rule falls on the plaintiffs, *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1138 (Ill. 1995), who have not presented evidence that the records were not reasonably accessible, leaving General Electric's contention that the records were publicly available unrebutted. Moreover, the plaintiffs admit neither Mr. Beggs nor his attorney sought any information about the contamination from the IEPA.

Other information about contamination in the area around the plant and golf course was publicly and readily available by the time of the May 29, 2007, sale. In 1988, a local newspaper reported on the contamination and that it had been traced to the General Electric plant. That year the City of Morrison shut down two of its municipal wells because of the contamination, which was also reported in the newspaper article. In 2004, the State of Illinois sued General Electric over the contamination in a case that remains unresolved.

In response, the plaintiffs contend that their state tort claims are timely because of the continuing tort doctrine. Under Illinois' continuing tort doctrine, "when 'a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease.'" *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (quoting *Belleville Toyota v. Toyota Motor Sales, U.S.A.*, 770 N.E.2d 177, 190 (Ill. 2002)). The doctrine applies for the duration of the tortious conduct, as distinguished from the duration of the damages that continue after the conduct ends. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003) ("A continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation.").

General Electric argues that the continuing tort doctrine is inapplicable because it is undisputed that its use of chlorinated solvents ended in 1994. The plaintiffs respond that General Electric misapprehends the continuing tort, which the plaintiffs argue is General Electric's continuing failure to remediate the contamination it caused. But the failure to remediate contamination left over from prior conduct is not a continuing tort. In *Soo Line R. Co. v. Tang Indus., Inc.*, 998 F. Supp. 889, 897 (N.D. Ill. 1998), the court held that Illinois' continuing tort doctrine did not apply because the last possible tortious conduct occurred in 1982 when the defendant vacated its scrap yard operation, even though the site of the former scrap yard

remained contaminated: "although the effects from Tang's violations may be persisting, any tortious activities by Tang ended in 1982." Likewise, in *Village of DePue v. Viacom Int'l, Inc.*, 713 F. Supp. 2d 774, 779 (C.D. Ill. 2010), the court held that Illinois' continuing tort doctrine did not apply because the last possible tortious conduct occurred in 1989, after the defendant had stopped operating its zinc smelting facility. The court rejected the plaintiff's argument that the continuing flow of contaminated water from the site of the former plant onto the plaintiff's property was a continuing tort: "Plaintiff alleges that it is continually re-injured by water flowing from the Site onto its property. Plaintiff does not allege that Defendants or their corporate predecessors engaged in any conduct aside from merely owning the Site after that date; the continuing tort doctrine therefore does not apply . . .". *Id. See also Powell v. City of Danville*, 625 N.E.2d 830, 831 (Ill. App. Ct. 1993) (continuing tort doctrine does not apply where defendant stopped operating landfill in 1974, but ground adjacent to landfill remained contaminated).

The facts of these cases stand in sharp contrast to situations involving contaminants that continue to leak into the environment and onto surrounding properties, as were the allegations in *City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817 (N.D. Ill. 2014). In *City of Evanston*, the court applied the continuing tort doctrine "at least at the pleadings stage," where the plaintiff alleged that contaminants continued to leak from underground storage tanks under the site of a former gasoline station. *Id.* at 827-28; *see also Leckrone v. City of Salem*, 503 N.E.2d 1093, 1101 (Ill. App. Ct. 1987) (defendant's continual dumping of sewage into a creek alleges a continuing tort).

The plaintiffs contend that cases like *Powell* and *Soo Line* are distinguishable because the defendants in those cases no longer owned the property or had long-ago vacated their operations. But in *Village of DePue*, 713 F. Supp. 2d at 779, the court explicitly held that "merely owning the Site" after the last act of contamination does not give rise to the continuing tort doctrine. Conversely, in *City of Evanston*, 19 F. Supp. 3d at 827-28, the court applied the continuing tort doctrine even though the defendant no longer owned the property, but where the defendant's underground tanks allegedly continued leaking contaminants into the environment. Thus, the applicability of the doctrine turns on continuing conduct, not continuing ownership or continuing injury.

Illinois' application of the continuing tort doctrine is not unique. For instance, in *First Virginia Banks, Inc. v. BP Exploration & Oil, Inc.*, 206 F.3d 404, 406-07 (4th Cir. 2000), the court held that Virginia's continuing tort doctrine did not apply to the continuous migration of petroleum hydrocarbons from the site of a former gasoline station onto the plaintiff's land where the tank from which the contaminants leaked was removed in 1986. Similarly, in *Haddonbrook Assocs. v. General Electric*, 427 Fed. Appx. 99, 102 (3d Cir. 2011), the court held that New Jersey's continuing tort doctrine required the breach of a "new" duty "apart from the duty to abate the contamination that is alleged in the nuisance claim." To hold otherwise would create an exception that swallows the rule that the doctrine does not apply to merely continuing injuries. *Gettis v. Green Mountain Economic Development Corp.*, 892 A.2d 162, 170 (Vt. 2005) ("The necessary tortious act cannot be the failure to right a wrong committed outside the limitation period. . . . If it were, the tort in many cases would never accrue because the defendant could undo all or part of the harm.").

Finally, the plaintiffs argue that the decision in *Menard, Inc. v. Wells Mfg. Co.*, No. 03 CV 8313, 2007 U.S. Dist. LEXIS 67010 (N.D. Ill. Sept. 11, 2007), supports their assertion that General Electric's continuing failure to remediate falls within the continuing tort doctrine. In *Menard*, the plaintiff argued that its state law tort claims were timely under the continuing tort doctrine because the defendants continued to violate their duty to remediate, resulting in the continued migration of contaminants. *Id.* at *7. The court held that the plaintiff's evidence created a genuine issue of material fact about whether the defendants met their duty to remediate, which precluded the court from determining as a matter of law that there was no continuing tort. *Id.* at *9. However, according to the *Menard* decision, the defendants argued only that the plaintiff had failed to set forth evidence creating a genuine issue of material fact. *Id.* at *7. The decision does not identify any argument by the defendants that the failure to remediate prior contamination is not a continuing tort, and, therefore, the court had no occasion to address or resolve the issue. Accordingly, *Menard* is not persuasive authority for disregarding that the failure to fix the continuing effects of prior conduct is not a continuing tort.

Given the inapplicability of the continuing tort doctrine, the Court now focuses on when the plaintiffs' state law claims accrued to determine whether under the discovery rule they were timely when filed on November 1, 2013. Under the relevant five year statute of limitations and the discovery rule, the claims were timely as long as the plaintiffs were not "possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved" until November 1, 2008, or later. *In re marchFirst, Inc.*, 589 F.3d at 903-04 (internal quotation marks and citation omitted). When the plaintiff is possessed of sufficient information concerning his injury to investigate whether actionable conduct was involved is usually a question of fact "'unless the facts are undisputed and only one conclusion may be drawn from them.'" *Abramson v. Abramson*, 772 F. Supp. 395, 398 (N.D. Ill. 1991) (quoting *Bates v. Little Co. of Mary Hospital*, 438 N.E.2d 1250, 1253 (Ill. App. Ct. 1982)).

General Electric argues that the plaintiffs had actual knowledge of the contamination of the area south of the General Electric plant including the golf course before the May 29, 2007, purchase of the course as evidenced by e-mails between Mr. Beggs' attorney and the seller, as well as the sales contract itself, all of which explicitly noted the contamination under the golf course. Mr. Beggs also admitted he saw a monitoring well on the course before he purchased it, and later in 2007 contacted General Electric to fix the well knowing at that time that the well monitored contaminants from the General Electric plant.

In addition, information publicly available to the plaintiffs should have further alerted them to the contamination. It is undisputed that the contamination was reported in 1988 in the local newspaper, which noted both that two Morrison municipal wells were closed as a result of the contamination, and that the IEPA traced the contamination to the General Electric plant. In 2010, the State of Illinois sued General Electric over the contamination in the circuit court of the Fourteenth Judicial Circuit. In addition, letters filed with the IEPA revealed the results of groundwater tests that showed levels of contaminants above the accepted MCL. The plaintiffs contend that unearthing those test results would have required them to review tens of thousands of pages of IEPA documents. But the plaintiffs concede that they never even tried, or for that

matter sought out any information other than the seller's disclosure that there was contamination under the first hole of the golf course, though the seller believed no further remediation was required. The plaintiffs also contend that they had no reason to know the true extent of the contamination until 2012, when General Electric tested groundwater from the north supply well and found TCE one-thousand times the MCL. But "the fact that it obtained more detailed information" later does not negate that by 2007 the plaintiffs knew or should have known of the contamination in the area of the General Electric plant including on the golf course, enough to put them "'on inquiry to determine whether actionable conduct is involved.'" *Village of DePue*, 713 F. Supp. 2d at 780-81 (quoting *Vector-Springfield Properties, Ltd. v. Central Ill. Light Co.*, 108 F.3d 806, 809 (7th Cir. 1997)).

Based on the undisputed facts, the plaintiff knew or should have known by 2007 sufficient information about the contamination to trigger the accrual of their state law claims. Accordingly, their claims filed six years later in 2013 are outside the five-year statute of limitations period.

### b.     Equitable Estoppel

Alternatively, the plaintiffs argue that General Electric should not be allowed to assert the statute of limitations defense to their state-law claims under the doctrine of equitable estoppel. Under Illinois law, equitable estoppel suspends the statute of limitations for the time that the defendant took active steps to prevent the plaintiff from suing. *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 385 (7th Cir. 2010). The party claiming equitable estoppel must establish each of the following: (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the misrepresentations were untrue; (3) the other party intended or reasonably expected the party claiming estoppel to rely on the misrepresentations; (4) the party claiming estoppel did not know the misrepresentations were untrue; (5) the party claiming estoppel reasonably relied on the misrepresentations in good faith to his detriment; and (6) the party claiming estoppel would be prejudiced by his reliance on the misrepresentations if the other party were permitted to deny their truth. *Orlak v. Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1011 (Ill. 2007). In addition, the party asserting equitable estoppel must have been diligent in its efforts to obtain enough information to determine whether it had a claim. *Shropshear v. Corporation Counsel of City of Chicago*, 275 F.3d 593, 598 (7th Cir. 2001); *Nickels v. Reid*, 661 N.E.2d 442, 447–48 (Ill. App. Ct. 1996) ("A party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others.") (internal quotation marks and citation omitted).

The plaintiffs contend that they reasonably relied on the "rosy picture" General Electric painted "of a site with low levels of contamination that were rapidly declining by the forces of nature through natural attenuation." Response [55] at 11. But the undisputed evidence does not support an application of the doctrine of equitable estoppel. First, the plaintiffs cannot show that they reasonably relied on General Electric's representations about the levels of contamination or natural attenuation because they admit that they never looked into the issue of contamination beyond the seller's statement that the golf course was contaminated but appeared not to require remediation. Moreover, they present no evidence that General Electric knew at the time that

natural attenuation would not work, or that any of the test results it filed with the IEPA were inaccurate. In short, the plaintiffs' broad accusations that General Electric covered up the true extent of contamination is insufficient to invoke the doctrine of equitable estoppel in the absence of evidence that General Electric made specific representations to the plaintiffs that it knew to be untrue at the time and of which the plaintiffs were aware and relied on.

In summary, the plaintiffs' state law tort claims accrued at least by 2007 when they knew or should have known of the contamination in the area of the General Electric plant and golf course, and they have identified no evidence to support application of either the continuing tort or equitable estoppel doctrines. Accordingly, the state law claims asserted in 2013 were filed outside the five-year statute of limitations period, are therefore untimely, and so General Electric's motion for summary judgment on Counts IV (nuisance), V (trespass), and VI (negligence) [48] is granted.

## CONCLUSION

For the reasons given, General Electric's motion for summary judgment on the state law claims [48] is granted, its motion for summary judgment on the federal environmental claim [57] is denied, and the plaintiffs' motion for summary judgment on the federal environmental claims [37] is granted as to liability. By 1/15/2016, the parties shall submit a joint position paper on how the Court should proceed to the preliminary injunction stage on Count I as well as the propriety of assessing fees and/or fines. Status hearing is set for 1/26/2016 at 9:00AM at which time the Court will discuss the parties' suggestions. The Court also urges the parties to give serious consideration and to confer with the other side on whether a settlement conference would be beneficial.

Date: December 18, 2015

By: _____

Iain D. Johnston
United States Magistrate Judge