## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| LAJIM, LLC, et al. | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | No. 13 CV 50348 |
| v. | ) | |
| | ) | |
| | ) | Magistrate Judge Iain D. Johnston |
| GENERAL ELECTRIC CO., | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

As beautifully illustrated in the movie *Avalon*, "can" differs from "may." Likewise, in the legal context, whether a court *could* enter mandatory injunctive relief differs from whether a court *should* grant that extraordinary relief. This case exemplifies that critical difference.

## I. BACKGROUND

### A. Site History[1]

From 1949 through 2010, General Electric ("GE") operated a plant in Morrison, Illinois ("City"). The plant manufactured appliance and automotive controls for products, including refrigerators, air conditioners, and motor vehicles. During the relevant time, the manufacturing process used chlorinated organic solvents to remove oil from parts. These solvents can break down into other matter, such as 1,2-dichloroethane (1,2-DCA), all of which are toxic and regulated by federal and state environmental agencies. GE stored the chlorinated solvents in degreasers located in the plant. The degreasers were decommissioned in 1994.

Beginning 1986, and continuing throughout the remainder of the 1980s and 1990s, various monitoring procedures – most at the order of the Illinois Environment Protection Agency ("IEPA") – detected the presence of solvents in and near the local water supply downgradient of GE's plant. Two of the City's municipal drinking water wells were closed as a result and the third had an air stripper installed by a contractor hired by GE to filter the water used by the City.

---

[1] The site background is set out in abbreviated form. A much more complete history, which this Court incorporates by reference, is included in the Court's order adjudicating the parties' cross motions for summary judgment. *See LAJIM, LLC v. General Elec. Co*, No. 13 CV 50348, 2015 WL 9259918, at *1-4 (N.D. Ill. Dec. 18, 2015).

Soil samples taken from around the degreaser sites also confirmed the presence of solvents in the soil.

In 2001, due to an IEPA order, GE hired a different contractor to conduct an extensive survey. Consequently, a report was issued that found that the Rock Creek, which flows through the contaminated area, was a natural divide that would prevent the solvents from migrating further south and that natural attenuation (functionally, allowing the plume of solvents to dissolve naturally over time) would deal with the rest. The IEPA rejected that report and concluded active remediation would be required to clean up the site. In 2004, the IEPA, through the Illinois Attorney General, filed suit against GE on state-law grounds seeking the costs it had expended as a result of the hazardous substance release and an injunction requiring GE to determine the nature and extent of the soil and groundwater contamination, and then to perform remediation. After years of litigation, on December 12, 2010, the suit resulted in a consent order between GE and the IEPA ("Consent Order").

## B. The Consent Order

Pursuant to the Consent Order, GE agreed to submit to the IEPA for its approval a series of plans and reports including the following: (1) a work plan to survey private wells, install additional monitoring wells, and complete additional soil borings; (2) a Focused Site Investigation Report ("FSI") summarizing the results of the work plan; (3) a Remedial Objectives Report ("ROR") to address the impact of the soil and groundwater contamination; and (4) a Remedial Action Plan ("RAP") to meet the remediation objectives identified in the ROR. In short, the process was to investigate the problem (the work plan), report on that investigation (the FSI), identify what goals needed to be met (the ROR), and then develop a plan to reach those goals (the RAP).

Under the terms of the Consent Order, the work plan was to be submitted within sixty days of the adoption of the order, which would be by February 22, 2011. After IEPA approval (which was not limited to a certain time frame), GE had sixty days to implement the work plan. From there, GE had one-hundred-eighty days to complete the work plan and submit the FSI. IEPA again had an indefinite time frame to approve the FSI, after which the ROR time limits became operative. GE was required to present the ROR by the either December 31, 2012, the day the last City well was abandoned, or ninety days after the FSI was approved – whichever was earlier. Following another indefinite approval period by the IEPA, GE was required to propose the RAP within ninety days of the ROR's approval. Assuming the IEPA took approximately ninety days to approve of GE's various plans (in reality, the IEPA took between 30-90 days to approve or reject all filings with one notable exception), the ROR should have been filed on or about May 22, 2012. Under the worst case scenario, pursuant to the Consent Order, the ROR had to be

filed by December 31, 2012. It is notable, however, that any of these dates were modifiable by agreement of the parties, although it is unclear that this ever occurred.

GE timely proposed its first work plan on February 18, 2011. The IEPA rejected that work plan on March 28, 2011. GE proposed a revised work plan on April 26, 2011, which was likewise rejected on July 12, 2011. Ultimately, an additional revised work plan was proposed on August 26, 2011 and approved—after additional negotiation—on November 30, 2011. The plan was implemented on December 5, 2011 and initially completed on January 27, 2012. However, supplemental investigatory work extended the work plan out another year, until January 30, 2013. The FSI—some 3,500 pages of data, sampling, and activity—was initially offered on April 26, 2013. But on July 25, 2013, the IEPA rejected the plan and ordered additional testing. On August 23, 2013, GE presented a supplemental work plan to address that additional testing. The IEPA approved this plan on October 11, 2013. On May 15, 2014, GE proposed an addendum to the FSI, which the IEPA rejected (or, more realistically, sought clarification concerning) on August 14, 2014. On October 23, 2014, GE responded to that rejection by letter, and the IEPA gave conditional approval for the FSI on March 18, 2015. That approval was reached after additional back-and-forth correspondence and some additional sampling. Finally, on June 18, 2015, GE provided its ROR. The IEPA rejected that ROR on February 10, 2016, to which GE responded on March 10, 2016. Following a meeting and additional discussions, the IEPA conditionally approved the ROR on August 10, 2016. To date, this Court has not been provided a copy of the approved ROR.

A great deal of investigatory work has been ordered and performed pursuant to the Consent Order. But the entire proceeding appears years off schedule. Moreover, no remediation has been performed anywhere on the site in the thirty years since the initial discovery of toxic contaminants traceable to GE's degreasers in the downgradient soil and water supplies of the City.

## C. This Citizen Suit

Plaintiffs, individuals and an entity that owns a golf course, filed a citizen suit against GE on November 1, 2013. *See* 42 U.S.C. §6972. They seek a mandatory injunction to require GE to remediate the contamination (Count I) under the Resource Conservation and Recovery Act ("RCRA"), *see* 42 U.S.C. § 6972(a)(1)(B); cost recovery (Count II) and a declaratory judgment (Count III) under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), *see* 42 U.S.C. § 9607(a) (cost recovery) and § 613 (g)(3) (declaratory judgment); and allege state law claims of nuisance (Count IV), trespass (Count V), and negligence (Count VI).

Following extensive discovery, on December 18, 2015, this Court granted summary judgment to plaintiffs as to liability on Count I.[2] The Court granted summary judgment to defendants on Counts IV-VI.[3] Having made these rulings, the parties then briefed three issues: (1) whether plaintiffs can establish the traditional required elements of injunctive relief; (2) whether plaintiff's injunctive relief request is moot in light of the Consent Order; and (3) whether this Court can contradict determinations made in the state-court proceedings or Consent Order. Dkt. #106. The main thrust of these three issues focuses on the availability and propriety of injunctive relief. The parties again provided helpful submissions.

## II. ISSUE

Currently before the Court is the question of what appropriate injunctive remedy, if any, is available to plaintiffs under RCRA. Specifically, plaintiffs seek a mandatory injunction for immediate active remediation, which GE opposes.

## III. CONTENTIONS OF THE PARTIES

GE contends that if a state-court proceeding already exists that covers the same scope of the relief sought by the citizen suit, then the plaintiffs are not entitled to injunctive relief in this Court. According to GE, this is true whether the Court considers the issue in the context of mootness or the lack of irreparable harm or however else phrased. Transcript of Report of Proceedings, August 18, 2016 at p. 45. In other words, "if the field is occupied by the state [this Court] cannot supplant

---

[2] In granting plaintiffs summary judgment, this Court found that plaintiffs' citizen suit was not barred because the IEPA's suit was not seeking to enforce §6972(a)(1)(B) of RCRA. *LAJIM*, No. 13 CV 50348, 2015 U.S. Dist. LEXIS 169753 at *19-20. In making that determination, this Court applied the plain meaning of the statute's terms. *Id.* As a result of the most recent briefing and argument, the Court again re-read and analyzed the critical cases affecting its decision as to liability on Count I, including, but not limited to *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483 (7th Cir. 2011) and *Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewage Dist.*, 382 F.3d 743 (7th Cir. 2004). Having re-read those cases, the Court is even more convinced that its summary judgment liability determination is correct, despite GE's protestations. In both of those decisions, the Seventh Circuit employed a plain meaning analysis and strictly applied RCRA's language, just as this Court used. Additionally, *Friends of Milwaukee's Rivers* was a Clean Water Act (CWA) case. The CWA has both a similar citizen suit provision as well as a barring provision. Citizen suits brought under the CWA allow for citizens to seek a civil penalty, but a State cannot obtain a civil penalty if it is proceeding under a comparable state statute. Accordingly, this provision evidences that Congress knows how to limit remedies in environmental cases when a State is proceeding under a comparable state law. If Congress wanted to bar RCRA citizen suits because the State was proceeding under a similar state statute, Congress would have said so.

[3] Counts II and III remain pending, and the parties have filed no dispositive motions as to those counts.

that with [its] own judgment." *Id.* at p. 46. GE made a similar argument as to liability. Transcript of Report of Proceedings, October 7, 2015 [Dkt. 79] at p. 72 ("This court has a duty to avoid duplication of suits, to avoid conflicting orders, and to [. . .] give deference to a state agency which has primary authority.").

Plaintiff contends that because it seeks broader injunctive relief, based in part on the IEPA's alleged failure to investigate and address aspects of the contamination, then not only is injunctive relief available, but also that it must be granted. *Id.*

## IV. ANALYSIS

### A. Whether This Court Could Enter Mandatory Injunctive Relief

Whether this Court *can* enter injunctive relief in a citizen suit, even when a state proceeding is ongoing, is squarely addressed by RCRA. And RCRA answers that question in the affirmative. Initially, any person may commence a civil action on his own behalf against any person who contributed to past or present handling, storage, treatment, transportation, or disposal of hazardous waste which may present an imminent and substantial endangerment to health or environment. 42 U.S.C. §6972(a)(1)(B). There is no dispute that GE is a "person" that handled or stored hazardous waste. Moreover, this Court has already determined that there may be an imminent and substantial endangerment to health or environment. However, that type of citizen suit is statutorily barred if the IEPA were diligently prosecuting an action under §6972(a)(1)(B). 42 U.S.C. §6972(b)(2)(C). This Court has already determined that because the State of Illinois was not prosecuting a case under §6972(a)(1)(B), the suit is not barred. Consequently, plaintiffs' citizen suit may proceed. And RCRA plainly authorizes injunctive relief in citizen suits. 42 U.S.C. §6972(a). Accordingly, once a court finds that the plaintiff has met the requirements of a citizen suit and the suit is not barred, a court has the power to stop further contamination as well as to remediate past contamination.

Therefore, despite GE's position, the plain language of RCRA gives this Court the power to enjoin GE. The real issue is whether this Court *should* enjoin GE under the particular facts of this case.

Case law supports this conclusion. Indeed, *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483 (7th Cir. 2011) – a case upon which GE heavily relies throughout this case – supports this Court's finding.[4] In *Adkins*, the Seventh Circuit specifically stated

---

[4] The Court is a bit confused by GE's heavy reliance on *Adkins*. This Court views *Adkins* as a bad case for GE on many levels, including, but not limited to, its reliance on the plain language of RCRA as well as its complete rejection of two abstention doctrines, the rationales of which GE repeatedly espouses. While this Court has previously stated and still remains concerned that it should not trample on a parallel state-court proceeding,

the following: "We do not suggest, of course, that once a citizen suit has cleared RCRA's statutory hurdles it is immune from all other constitutional and preclusive doctrines, such as standing, mootness, and claim or issue preclusion." *Id.* at 503. This statement evidences GE's error. There would be no reason for the Seventh Circuit to make this statement if injunctive relief were not available. Instead, *Adkins* finds that courts should consider these doctrines under the particular facts of a case before granting injunctive relief. This clear statement likewise rejects plaintiffs' assertion that once they meet RCRA's statutory requirements they are presumptively entitled to relief. *See also Phoenix Beverages, Inc. v. Exxon Mobil Corp.,* No. 12 CV 3771, 2015 U.S. Dist. LEXIS 16959, *12 (E.D.N.Y. Feb. 11, 2015) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545, 542 (1987)).

B. Whether This Court Should Enter Mandatory Injunctive Relief

In determining whether mandatory injunctive relief should be awarded, the Court must consider the nature of the relief (including the traditional elements of injunctive relief) as well as the appropriateness of the relief sought under the facts of the case.

1. Nature of Mandatory Injunctive Relief

As this Court has previously determined, a plaintiff in a citizen suit must meet the traditional elements for injunctive relief. *LAJIM, LLC v. General Electric Co.*, No. 13 CV 50348, 2016 U.S. Dist. LEXIS 19183, *11 (N.D. Ill. Feb. 17, 2016). Nothing plaintiffs have presented in the latest round of filings requires a different determination. Indeed, plaintiffs continue to ignore the important distinction between when a government agency is statutorily authorized to seek and obtain injunctive relief, in which case the elements of injunctive relief are not necessary, and when a citizen brings its own private suit seeking injunctive relief. *Compare*

---

*Adkins* holds that once Congress has considered those precise concerns and nevertheless authorized federal courts grant injunctions, those concerns are all but eliminated. *Adkins*, 644 F.3d at 506 ("[W]e recognize that the busy district court's decision to abstain in this case was based on a healthy respect for state courts and a desire to avoid duplicating or interfering with their efforts. For the reasons we have explained, we believe the congressional policy choices reflected in the RCRA citizen-suit provisions remove the abstention options from the district court's toolbox."). Having said that, the Court recognizes that the jurisprudential concerns underpinning abstention doctrines (that the *Adkins* decision says do not apply) are kissing cousins to other court created jurisprudential restraints, such as mootness and standing (that the *Adkins* decision says may apply). Additionally, although GE focuses on footnote 2 of *Adkins*, that footnote does not support GE's positions in this case. As noted previously, the Seventh Circuit did not address the citizen suit bar under §6972(b)(2)(C). *LAJIM*, 2015 U.S. Dist. LEXIS 169753 at *26-27. Moreover, the Seventh Circuit explicitly noted that the State of Indiana did not commence its own RCRA "endangerment" action, and as a result, that case could not address the specific bar at issue here which would prevent a citizen suit under §6972(a)(1)(B).

*Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (where CFTC seeks injunction under authorizing statute, it "need not meet the requirements for an injunction imposed by traditional equity jurisprudence.") *with United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994) ("Ordinarily, a court is obligated to conduct an equitable balancing of harms before awarding injunctive relief, even under an environmental statute which specifically authorizes such relief (as does RCRA section 3008(a)).").

The required elements of injunctive relief are the following: an irreparable injury; an inadequate remedy at law; a balancing of hardships favoring an injunction; and a showing that the public interest weighs in favor of the relief. *LAJIM*, 2016 U.S. Dist. LEXIS 19183 at *11 (citing *Maine People's Alliance & Natural Resources Defense Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006)). Critically, it is important to remember four aspects of injunctive relief. First, injunctive relief is discretionary. *EEOC v. AutoZone*, 707 F.3d 824, 840 (7th Cir. 2013). Second, because the relief is discretionary, two different judges faced with identical facts can exercise their discretion differently, and both still be acting within the scope of their discretion. *See United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996). Third, the decision to grant or deny an injunction is heavily driven by the particular facts of a case. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* 774 F.3d 191, 205 (3d Cir. 2014) (in determining whether to grant injunctive relief the court must exercise it equitable discretion in a case-by-case, fact specific manner). Fourth, even if an injunction is warranted, fashioning the scope of the injunction is fact driven. *In re Mirant*, 378 F. 3d 511, 522 (5th Cir. 2004). Additionally, because plaintiffs seek remediation by GE, they seek a mandatory injunction. *See Schrier v. University of Colorado*, 427 F. 3d 1253, 1261 (10th Cir. 2005) (mandatory injunctions require nonmovant to act in a particular manner). Consequently, plaintiffs must meet an even higher burden. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011).

## 2. Determining the Appropriateness of Injunctive Relief

Numerous cases exist regarding the availability and propriety of injunctive relief in citizen suits under the various federal environmental statutes, including RCRA. Each side did an excellent job surveying a vast array of those cases and was able to mine the Federal Reporter, LEXIS and Westlaw and present cases it believed were helpful to their cause. GE cited a particularly relevant Clean Air Act case, involving a requested injunction in a citizens suit and the CAA's "diligent prosecution" bar. *Group Against Smog and Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116 (3d Cir. 2016). *Group Against Smog and Pollution* stands for some helpful propositions for GE, including that merely because the state may not be taking the precise remedial action desired by the citizen plaintiffs or is moving slowly does not mandate injunctive relief. But many of the other cases GE cites are easily distinguishable because they involve situations in which the citizen plaintiffs fail to

adequately identify what more they desire by way of remediation or the citizen plaintiffs seek nearly the identical relief obtained by the state. *Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 140 (3d Cir. 2013) ("Trinity has not contended that the remediation scheme put in place by the Consent Order is deficient or ineffective."); *Center for Biological Diversity, Inc. v. BP America Prod. Co.*, 704 F.3d 413, 431 (5th Cir. 2013) ("The [plaintiff] does not dispute that cleanup efforts are and have been ongoing in the Gulf, and it identifies no deficiency in those efforts."); *Stratford Holding, LLC v. Foot Locker Retail Inc.*, No. CIV 12-772, 2013 U.S. Dist. LEXIS 145120, *13 (W.D. Ok. Oct. 8, 2013) ("A consent order has been entered, which plaintiff does not allege will fail to remedy the contamination."); *Clean Harbors, Inc. v. CBS Corp.*, 875 F. Supp. 2d 1311, 1331, 1332 (D. Kan. 2012) ("Problematically, however, [plaintiff] fails to specify what 'additional obligations' it has in mind." and "[Plaintiff] does not specify how the relief it seeks as against [defendant] would differ from or supplement [its] own obligations under the RCRA permit."); *87th Street Owners Corp. v. Carnegie Hill-87th Street Corp.*, 251 F. Supp. 2d 1215, 1219 (S.D.N.Y. 2002) ("And, despite repeated requests from the Court, plaintiff has been unable to describe a single action that defendant could be ordered to take to reduce or eliminate any risk its past actions may have caused, that is not already being undertaken by DEC.").[5]  In those cases, the courts routinely find that they will not exercise their discretion in granting injunctive relief.[6]  But even these types of cases recognize that citizen suits under RCRA are routinely allowed to proceed despite parallel state proceedings. *Stratford Holding, LLC v. Foot Locker Retail Inc.*, No. CIV 12-772, 2013 U.S. Dist. LEXIS 145120, *11 (W.D. Ok. Oct. 8, 2013).  Indeed, *Phoenix Beverages* rejects GE's overly broad argument that the existence of the Consent Order prevents this Court from enjoining it:

> "Defendants' reliance on cases such as *Rococo Assocs., Inc. v. Award Packaging Corp.,* 803 F. Supp. 184, 192 (E.D.N.Y. 2011) for the proposition that Plaintiffs cannot obtain relief under RCRA because of DEC's ongoing oversight is misplaced. . . In those cases, a remedial scheme already was underway or had concluded, such that there was nothing more that the Court could direct any party to do in furtherance of RCRA's goal of remediating the hazardous waste. . . By contrast, Defendants remedial investigation report was only submitted to the DEC in November 2014, and has not yet resulted in remedial measures.  DEC involvement does not by itself divest this Court of jurisdiction to award relief under RCRA.

---

[5] Additionally, nearly all of GE's cases involve the issue as to which entity is required to pay for clean up costs, which is not an issue under RCRA, and as a result, not a basis for an injunction.

[6] Most of the cases cited by the parties are "diligent prosecution" bar cases.  This is not surprising.  The same type of facts that are important to determine whether a state is diligently prosecuting a case are the type of facts that relate to whether the citizen plaintiffs are seeking injunctive relief of a different scope than the state.

*Phoenix Beverages, Inc.*, 2015 U.S. Dist. LEXIS 16959 at *19, n. 5. And critically, in most (but not all) of the cases by GE, *remediation was occurring*.

But the case before this Court is different. Without doubt, here, much investigation and monitoring has occurred. However, it is uncontested that GE has not taken *any* remediation actions to clean up what this Court has already found to be an imminent risk to the health and environment. Plaintiffs adamantly assert that the scope of the relief they seek is far different that the remediation the IEPA will impose, and plaintiffs have specifically identified the precise mandatory injunction they seek. [Dkt. #121, Ex. 2.] As a result, it is not surprising that plaintiffs rely upon *Interfaith Community Organization v. Honeywell International, Inc.*, 399 F.3d 248 (3d Cir. 2005). In that case, the district court held a bench trial to develop the factual record. In *Interfaith*, the Third Circuit found that the district court did not abuse its discretion in imposing an injunction. *Id.* at 268. After finding recalcitrance and delay, the district court fashioned what it believed was an appropriate injunction under the particular facts. Critically, the district court specifically required injunctive relief that the state agency may have thought was unnecessary. *Id.* at 266. Indeed, the Third Circuit stated the following: "Depending on the particular characteristics of a given RCRA site, as found by a district court on a cases-by-case basis, particular types of injunctive relief may not be circumscribed by arguments as to what an agency might have done." *Id.* at 267-68.

During argument, GE's counsel colorfully described *Interfaith* as "the poster child for a recalcitrant company challenging a federal judge," and claimed that *Interfaith* only authorized a federal court to enter an injunction if the state proceeding was "a train wreck." Transcript of Report of Proceedings, August 18, 2016 at p. 39, 40. In doing so, GE's counsel rightfully attempted to distinguish *Interfaith* on its facts. And GE correctly stated that *Trinity* distinguished *Interfaith*. But importantly, *Trinity* distinguished *Interfaith* on the basis that the plaintiffs in *Trinity* had "not contended that the remediation scheme put in place by the Consent Order [was] deficient or ineffective." *Trinity*, 735 F.3d at 140. That is precisely what plaintiffs in this case have done. Plaintiffs have steadfastly asserted that the Consent Order is deficient and ineffective. Plaintiffs will be required to establish that assertion.

The parties have bickered back and forth about the scope of the IEPA remediation. But the IEPA has not yet authorized the RAP so no remediation has even occurred, and this Court has not been provided the ROR. Consequently, the Court is unable to determine whether the scope of remediation plaintiffs seek is similar to that found to be appropriate by the IEPA, let alone warranted. Facts matter. Courts routinely analyze the precise facts relating to the underlying state consent order to compare those to the relief citizen plaintiffs seek. Indeed, *Group Against Smog and Pollution* provides a good example of a court engaged in that fact intensive inquiry. *Group Against Smog and Pollution*, 810 F.3d at 131-32.

Similarly, the court in *Phoenix Beverages* denied the motion for preliminary injunction based on the facts before it; namely, that the plaintiffs had failed to present evidence that the methane under the concrete slab of the building was likely to ignite or migrated to an enclosed space where ignition might occur so no irreparable injury existed. *Phoenix Beverages,* 2015 U.S. Dist. LEXIS 16959 at *14.

## V. ACTION PLAN

Accordingly, this Court finds that it has the authority to enter mandatory injunctive relief. But this Court also finds that before it can determine whether plaintiffs have met their heavy burden to afford them the injunctive relief they seek, the Court needs facts. *See Adkins,* 644 F.3d at 496 (noting that on remand factual record needed to be developed to determine whether there was an overlap between state court suit and federal citizen suit). Additionally, in recognizing the careful balance between the statutory rights authorized by RCRA on one side of the scale, and the jurisprudential concerns behind the mootness doctrine and the need to show irreparable harm on the other side of the scale, the Court will defer for a reasonable period of time to allow the RAP to be developed and considered by the IEPA. This deferral will also allow the Court the opportunity to compare the scope of the remediation in the RAP and compare it to the scope of the relief plaintiffs have already proposed so that it can better determine if plaintiffs seek to supplement or supplant the Consent Order. *See Supporters to Oppose Pollution, Inc. v. Heritage Group,* 973 F.2d 1320, 1324 (7th Cir. 1992). As a result, the Court will take the following actions.

By October 31, 2016, the parties are to file a joint status update regarding the Consent Order. Depending on the status of the implementation of the Consent Order, this Court currently intends to hold a hearing to make factual findings as to the extent of the contamination for which this Court already found GE liable in an effort to determine whether injunctive relief is appropriate. The factual hearing is scheduled for February 23 (and 24, if necessary), 2017, at 10:00 a.m. On February 14, 2017, at 10:00 a.m., the Court will hold a status concerning the scope of and what witnesses will appear at that hearing. Lead counsel must appear in person. The Court also invites the IEPA and the Illinois Attorney General to send representatives to the hearings to inform the Court of the State's position on the IEPA's progress with the Consent Order as well as its view, if any, as to whether this Court should enter mandatory injunctive relief requiring remediation and the scope of remediation. *See Adkins*, 644 F.3d at 487 ("The district court may certainly coordinate its efforts with the state courts, and may use its sound discretion in doing so...."). To be blunt, the Court is inviting an amicus brief or presentation from the State on these issues. The parties are ordered to provide a copy of this order to the IEPA and the Illinois Attorney General's Office. The parties are also ordered to provide a copy of this order to the Office of the Circuit Clerk for the Fifteenth

Judicial Circuit, Carroll County and the Honorable Val Gunnarsson, Presiding Judge, Carroll County, Illinois (the "Other Interested Entities"). The Other Interested Entities are not required to take any action in response to this order or to attend the February 14, 2017 status, but are merely invited. Moreover, by providing notice and inviting the IEPA, the Illinois Attorney General's Office, and the Other Interested Entities, the Court is not signaling what, if any, injunctive relief it might order. At this point, the Court needs facts to determine whether the extraordinary remedy of mandatory injunctive relief is appropriate under the specific facts of this case and if so, what that relief would entail. By January 31, 2017, the parties are also ordered to file with the Court a copy of the ROR as well as the final and approved RAP, if it exists.

Entered: October 4, 2016                    By:_____
                                                 U.S. Magistrate Judge
                                                 Iain D. Johnston