# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| LAJIM, LLC, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 13 CV 50348 |
| | ) U.S. Magistrate Judge Iain D. Johnston |
| General Electric Co., | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

### INTRODUCTION

From the moment the parties consented to the undersigned's jurisdiction, the Court has read, re-read, analyzed and re-analyzed the language of the Resource Conservation and Recovery Act ("RCRA"), *see* 42 U.S.C. § 6901 *et seq.*, so that it could precisely comply with a complicated statutory scheme that attempts to balance a host of competing interests involved in the important function of remediating toxic contaminants. That should be no surprise. A federal court is duty bound to follow Congressional mandates, even when the result reached is different than what the court would have liked. *See Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1325 (7th Cir. 1992) ("[C]ourts have no business bending one statute out of shape because litigants (or even the judges) believe that Congress should have written another statute differently."); "A judge who likes every outcome he reaches is very likely a bad judge." Neil Gorsuch, Remarks Upon Being Nominated to the U.S. Supreme Court (Jan. 31, 2017) *in* CHI.

1

TRIB., Jan. 31, 2017, http://www.chicagotribune.com/news/opinion/editorials/ct-neil-gorsuch-trump-supreme-court-nominee-edit-0202-20170201-story.html (last visited Sept. 7, 2017). But, sometimes, Congressional mandates can be a little hazy. RCRA is an example of a foggy statute. So, not surprisingly, the Court looked to controlling Seventh Circuit case law for guidance as well. In this regard, the Court was informed by the Seventh Circuit's excellent and helpful decision in *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483 (7th Cir. 2011). Tellingly, the *Adkins* opinion begins with an explication of RCRA. Again, this Court re-read and re-analyzed *Adkins* to guide it as it proceeded down the murky path of RCRA litigation. Indeed, this Court scrupulously followed *Adkins*' guidance in many ways. For example, as counseled by *Adkins*, this Court coordinated with the Fifteenth Judicial Circuit, Illinois Attorney General's Office and Illinois Environmental Protection Agency ("IEPA"). *Adkins*, 644 F.3d at 506; Dkts. #123, 138 at 10 (soliciting an amicus brief), 142-43. As noted later, this coordination proved invaluable to obtain the views of the IEPA. Likewise, this Court ensured that it developed a sufficient factual record of all the information it needed to properly evaluate Plaintiffs' request for mandatory permanent injunctive relief. *See Adkins*, 644 F.3d at 496 ("These and other relevant issues may be properly addressed on remand with more information than is available from the limited record on a motion to dismiss for failure to state a claim."); Dkt. #155 at 2 (rescheduling the evidentiary hearing to allow time to review Defendant's Remedial Action Plan and the State's anticipated amicus brief). Again, as noted later, the facts developed at the evidentiary hearing

were critical to this Court's determination.  And, finally, the Court held an evidentiary hearing to press Plaintiffs to provide evidence why they should be afforded the relief requested.  *Adkins*, 644 F.3d at 506 ("If [the state agency] should achieve comprehensive relief in its state court lawsuits, the federal judge will be entitled to press the citizen-plaintiffs as to what more they hope to accomplish in this suit."); Dkt. #138 at 10 (setting an evidentiary hearing to determine whether injunctive relief is appropriate in light of the Consent Order).  Only after hearing from the parties' respective experts, viewing the voluminous record as a whole and questioning Plaintiffs' counsel and expert, the Court was able to confidently and comfortably come to the conclusion that, based on the facts presented and in the exercise of its discretion, the Court will not grant a mandatory permanent injunction.  Plaintiffs have simply failed to meet their high burden.

## MANDATORY INJUNCTIVE RELIEF UNDER RCRA

With exceedingly clunky language, under certain limited circumstances, RCRA empowers federal district courts to enter mandatory permanent injunctions to require companies to remediate their contamination.  Because the precise wording of the statute is important, the language is quoted here.  But because the Court is not sadistic, only the relevant provisions are quoted:

> [A] person may commence a civil action on his own behalf . . . against any person . . . including any. . . past or present owner or operator of a . . . storage . . . facility, who has contributed. . . to the past or present handling [or] storage . . . of any . . .

hazardous waste which may present an imminent and substantial endangerment to health or the environment. . . The district court has jurisdiction . . . to restrain any person who has contributed. . . to the past. . . handling [or] storage . . . of any . . . hazardous waste . . . [or] order[ ] such person to take such other action as may be necessary, or both. . .

42 U.S.C. § 6972(a)(1)(B), (a)(2).

Despite the awkward wording, courts have consistently found that all types of injunctive relief are available. *Interfaith Community Organization v. Honeywell Int'l, Inc.*, 726 F.3d 403, 411 n.3 (3d Cir. 2013); *Litgo New Jersey Inc. v. Commissioner of New Jersey Department of Environmental Protection*, 725 F.3d 369, 393 (3d Cir. 2013); *Voggenthaler v. Maryland Square LLC*, 724 F.3d 1050, 1056 (9th Cir. 2013) ("RCRA, in 42 U.S.C. § 6972, authorizes citizen suits for two types of injunctive relief – an injunction ordering the responsible parties to clean up the contamination and an injunction ordering them to stop any further violations.").

Before the Court is Plaintiffs' request for a mandatory permanent injunction.[1] To obtain a permanent injunction, a plaintiff must establish the following: (1) it has suffered an irreparable injury; (2) legal remedies, such as damages, are inadequate

---

[1] The Court, and apparently the parties, have operated under the assumption that at this stage of the proceedings the Court is being asked to issue a mandatory permanent injunction. The assumption is based on the fact that Plaintiffs seek to change the status quo, and that this Court has already ruled in Plaintiffs' favor on liability under RCRA. Important differences exist between preliminary and permanent injunctions. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). One important difference is that the movant must succeed on the merits, not just that it is likely to do so. *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996).

to compensate for that injury; (3) considering the balance of hardships between the plaintiff and the defendant, an equitable remedy is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In this case, this Court has already stated that Plaintiffs must establish all these elements. *LAJIM, LLC v. General Electric Co.*, 13 CV 50348, 2016 U.S. Dist. LEXIS 137448, at *14-15 (N.D. Ill. Oct. 4, 2016). The Court reiterates its view that Plaintiffs must establish each element. To be sure, some cases hold that a civil plaintiff need not meet all the traditional elements of injunctive relief if a statute authorizes the relief. *See, e.g., Illinois Bell Telephone Co. v. Illinois Commerce Commission*, 740 F.2d 566, 571 (7th Cir. 1984). But those cases have been limited; they apply only when the specific statutory language at issue clearly requires injunctive relief for a particular set of circumstances. *See Bedrossian v. Northwestern Memorial Hospital*, 409 F.3d 840, 843 (7th Cir. 2005). This limitation is consistent with subsequent United States Supreme Court case law. *See, e.g., eBay*, 547 U.S. at 391 ("[A] major departure from the long tradition of equity practice should not be lightly implied."). When a statute merely authorizes a district court to grant injunctive relief, rather than requires the relief, a plaintiff must meet all the traditional elements of injunctive relief. *Daveri Development Group, LLC v. Village of Wheeling*, 934 F. Supp. 2d 987, 1007 (N.D. Ill. 2013). Because RCRA authorizes, but does not require, injunctive relief, Plaintiffs must

establish all the traditional elements for a permanent injunction, including irreparable harm.

A showing of irreparable harm is an essential requirement of injunctive relief. *Alabama v. United States Army Corp. of Engineers*, 424 F.3d 1117, 1133 (11th Cir. 2005) (irreparable injury is sine qua non of injunctive relief). Indeed, irreparable harm is the most important requirement. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). For harm to be "irreparable," it must be both certain and great, not merely serious or substantial. *New Mexico Department of Game and Fish v. United States Department of Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017).

As this Court has previously held, because Plaintiffs seek an order requiring General Electric to investigate and remediate (which might be different than that required by the IEPA under the Consent Order), Plaintiffs must meet an even higher standard for this mandatory injunction. *LAJIM, LLC v. General Electric*, 13 CV 50348, 2016 U.S. Dist. LEXIS 137448, at *16 (N.D. Ill. Oct. 4, 2016) (citing *Schrier v. University of Colorado*, 427 F.3d 1253, 1261 (10th Cir. 2005) and *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011)). Mandatory injunctions are "cautiously viewed and sparingly issued." *Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

## ISSUE

Throughout this litigation, General Electric's counsel has passionately argued that this Court should not grant Plaintiffs' requested injunctive relief that would interfere with the Consent Order. General Electric asserted that this Court

6

should deny the request based on the Consent Order reached in the parallel state-court proceedings, regardless of what label is placed on the reasoning for the denial. Dkt. #79 (October 7, 2015 Report of Proceedings, pp. 72, 103) ("This court has a duty to avoid duplication of suits, to avoid conflicting orders. . ."; "whether you call it mootness, diligent prosecution, lack of entitlement to injunctive relief. . ."). The Court understands that parties are usually more interested in judgements than rationales. But this Court must properly analyze the requested relief, and a more nuanced[2] approach is required.

The issue is not simply that a parallel state-court proceeding exists. If that were the main focus, then *Adkins* would not have scotched any reliance on the various abstention doctrines. *Adkins*, 644 F.3d at 506 ("For the reasons we have explained, we believe the congressional policy choices reflected in the RCRA citizen-suit provisions remove the abstention options from the district court's toolbox.").

Instead, the issue is what remedies are sought and what relief has been granted in those parallel state-court proceedings. Specifically, this Court must focus on whether those parallel state-court proceedings are repairing Plaintiffs' injury. If they are, then a mandatory permanent injunction should not issue.

In conducting the analysis, the facts that courts have considered under a "diligent prosecution" inquiry are relevant to the irreparable harm analysis. Just as the same facts can be used by a plaintiff to plead a variety of claims, the same facts can be used by a defendant to establish a multitude of defenses. The Court

---

[2] Unlike Modell from *Diner*, the Court is comfortable with the word "nuance" and believes that it is a real word.

disagrees with General Electric's conflation of the various defenses into an amalgam barring Plaintiffs' claims and relief. But the Court agrees with General Electric that when it reviews the record from December 2010 – when the Consent Order was entered – to today, the requested mandatory permanent injunction under RCRA is not warranted. Dkt. #79 (October 7, 2015 Report of Proceedings, p. 103).

Throughout the litigation, Plaintiffs have strenuously argued that the IEPA's analysis was flawed from the beginning, and, consequently, the horizontal and vertical extent of the contamination has not been properly determined. Dkt. #38 at 20-24, 34-38 (Plaintiffs' memorandum in support of summary judgment). But at the injunction hearing, General Electric's expert witness provided reasonable, rational and credible bases explaining why certain actions were taken and others were not.

Moreover, the IEPA's recent rejection of General Electric's Remedial Action Plan undermines Plaintiffs' requested relief. *See* Dkt. #179 at p. 1 (stating that on June 21, 2017, the IEPA rejected General Electric's Remedial Action Plan). At the injunction hearing, General Electric made a forceful, coherent and non-frivolous argument that natural attenuation in conjunction with institutional controls and monitoring was a sufficient remedy. General Electric made this same pitch to the IEPA. At the injunction hearing, Plaintiffs presented contrary evidence and arguments to General Electric's remedial plan. And, as it turns out, the IEPA agrees with Plaintiffs – at least in part in this regard. The IEPA rejected General Electric's Remedial Action Plan. Dkt. #179, p. 4-5 (rejecting General Electric's

8

proposal of institutional controls and monitored natural attenuation). In short, the IEPA's rejection of General Electric's Remedial Action Plan under the Consent Order remedied – at least in part – Plaintiff's harm.

## PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN ESTABLISHING ENTITLEMENT TO A MANDATORY PERMANENT INJUNCTION

Plaintiffs have maintained that the parallel state-court proceedings, which produced the 2010 Consent Order, are insufficient to remedy their injury. Plaintiffs argue that the measures outlined by General Electric in the Remedial Action Plan, namely institutional controls and monitored natural attenuation, are inadequate to remove the contamination at the site. This is based largely on Plaintiffs' contention that any remedial measures would be premature at this stage because the extent of the contamination has not been properly determined. Therefore, Plaintiffs seek an injunction that would require General Electric to complete a thorough investigation of the site to properly identify the measures required to remove the contamination.

At the evidentiary hearing, Plaintiffs focused on the inadequacy of General Electric's investigation of the site. As a result, Plaintiffs' retained expert provided limited testimony about the effectiveness of the remedial measures outlined by General Electric. Instead, Plaintiffs' expert testified that additional investigation and testing was necessary to opine on the proper scope of remediation for the site. Accordingly, without showing General Electric's investigation into the site was inadequate, Plaintiffs have not provided the evidence necessary for this Court to second guess General Electric's Remedial Action Plan of institutional controls and

monitored natural attenuation, even though the IEPA has yet to approve these measures.

Despite several revisions to General Electric's Focused Site Investigation Report and the IEPA's ultimate approval of it, Plaintiffs are requesting that General Electric perform the following investigation of the site to determine the extent of the contamination: (1) determine if dense non-aqueous phase liquid ("DNAPL") containing the trichloroethylene ("TCE") and 1,1,1 trichlorethane ("TCA") solvents previously used by General Electric is present at the General Electric plant; (2) define the horizontal and vertical extent of groundwater contamination at the General Electric plant and all downgradient areas; (3) understand the behavior of Rock Creek and why contamination is present in the south irrigation well; and (4) determine the source of and monitor chlorinated solvent vapors inside the golf course clubhouse, the former home of Lowell Beggs and Martha Kai Conway, and the surrounding residences. *See* Dkt. #111, p. 9-10. As part of this investigation, Plaintiffs propose soil borings that would penetrate the bedrock, installation of additional and deeper monitoring wells ("MW"), additional sampling of the new and existing wells, and implementation of long-term vapor intrusion monitoring for Plaintiffs' properties and the surrounding residences. *Id.* Many of these issues are interrelated, but the Court will address each in turn.

DNAPL and Groundwater Contamination

Plaintiffs, through their retained expert Dr. Konrad Banaszak, argue that the investigation of the site to date has not adequately determined whether DNAPL

10

is present in the geologic materials under the General Electric plant property and extending under and beyond Rock Creek and how far it has penetrated below the surface.  Plaintiffs are concerned that a DNAPL would act as a continuing source of contamination at the site.  Plaintiffs argue that without additional testing and remediation efforts, nothing prevents the DNAPL (if one exists) from leaving the General Electric plant and migrating south of Rock Creek.

Plaintiffs admit that they are putting forward an untested theory regarding the extent of the contamination.  As General Electric noted at the hearing, Plaintiffs merely offer different conclusions about the data collected by General Electric and the data they hope to develop with additional investigation and testing.  At no time before or during this litigation have Plaintiffs or Dr. Banaszak tested the groundwater or soil.  Dr. Banaszak visited the site once in 2013, but he did not take any samples.[3]  Instead, Plaintiffs have asked the Court "to look at the underlying facts and the data and importantly to take notice of the data that has *not* been gathered…" Dkt. #177 (June 1, 2017 Report of Proceedings, p. 31) (emphasis added).  Dr. Banaszak testified that groundwater sampling was not prohibitively expensive;[4] yet, no sampling was conducted by Plaintiffs.  Not even on the property that Plaintiffs own.

[3] Dr. Banaszak explained that any single sample he would have collected would not add much to his understanding of the site because samples would need to be taken over a long period of time to show a trend. As it is now 2017 and the case was filed in 2013, had additional testing started when the case was filed, there would at least be four years of data.
[4] Dr. Banaszak testified that it would cost approximately $2,000 to $2,500 to have someone travel out to the site, take a field sample from one of the wells, and submit it to a laboratory

Despite not taking a single sample, Dr. Banaszak opined that the soil borings at the two degreaser locations in the plant's main building did not go deep enough to rule out DNAPL because "the lowest boring still had evidence of contamination at reasonable, substantial levels." Dkt. #177 (June 1, 2017 Report of Proceedings, p. 54). Dr. Banaszak opined that any TCE contamination spilled onto the ground at the degreaser locations would eventually travel into the bedrock through various cracks and fissures. Dr. Banaszak argued that drilling into the bedrock to sample groundwater was possible and not too costly, generally tens of thousands of dollars. Dr. Banaszak testified that he would need additional information to determine if it would be necessary to drill below the bedrock to sample the deep aquifer material for contamination. Dr. Banaszak disagreed with General Electric's determination that it would take 4,000 years for groundwater to penetrate all the way through the Maquoketa Shale. He opined that the Shale near the site was highly fractured and that groundwater could move more quickly through those fractures, but he was unsure how much faster because he did not make any independent calculations. He also opined that despite sealing and closing City Well 1,[5] the investigation to date has not shown that it was the only conduit for contamination to travel below the Maquoketa Shale.[6]

Additionally, Dr. Banaszak was concerned that neither soil borings nor monitoring wells were installed at a possible third degreaser in Building 14. Dr.

_____

to have it analyzed. However, it would only cost $500 to actually take the sample and $150 to pay a laboratory to analyze it.

[5] City Well 1 penetrated the Shale because it was over 1,000 feet deep.

[6] The Maquoketa Shale begins approximately 225 feet below the surface and ends approximately 400 feet below the surface.

Banaszak opined that contaminated groundwater under Building 14 would travel north, not south. Accordingly, if groundwater traveled north, the samples taken from soil borings 15 and 41, located south of Building 14 and revealing no significant source of contamination, would not shed light on the extent of any contamination from a third degreaser. Dr. Banaszak opined that additional and deeper soil borings and monitoring wells would need to be installed and sampled to determine if contamination was released from the possible degreaser located in Building 14.

Overall, Dr. Banaszak opined that the data collected throughout the site did not show that the contamination plume is stable or shrinking, which leaves the possibility that a DNAPL exists. He argued that contamination detected in the monitoring and irrigation wells hundreds of feet from the General Electric's plant suggests there is a DNAPL. But Plaintiffs conducted no testing to confirm this "suggestion." He also argued that the north irrigation well was drawing water, and contamination, out of the bedrock. Additionally, Dr. Banaszak noted that the two monitoring wells north of Rock Creek, MW 7 and 8, had been sampled only twice and revealed a wide variability in the contamination level.

In response to Plaintiffs' arguments, General Electric presented the testimony of its retained expert Dr. Peter Vagt, who has been the project director of this site since 2008. Dr. Vagt testified that any additional investigation is unnecessary. Dr. Vagt testified that based on the soil samples taken from the area around the General Electric plant, there was no evidence DNAPL was present.

Pursuant to the IEPA's directive, General Electric performed a CSAT[7] analysis on the soil samples collected to determine the concentration for each volatile organic compound. If any of the soil samples were above a threshold CSAT number for any volatile organic compound, the IEPA would find DNAPL present. However, none of the samples General Electric analyzed exceeded the CSAT number.

The IPEA even requested a more detailed explanation from General Electric regarding soil concentrations near the main building and the two degreasers. In particular, monitoring well G105D was installed near the central degreaser and groundwater samples were taken from 1987 until 2014. *See* Dkt. #166-6 (General Electric's Exhibit V). Dr. Vagt testified that the earlier samples revealed very high concentrations of TCE, which suggested DNAPL may be present. However, the concentrations dropped significantly over time, eventually down to 1/1,000 of the original concentration. Dr. Vagt interpreted this to mean the source of TCE and TCA had dispersed and there was not a continuing source of TCE and TCA underneath the plant feeding a plume of contamination. He opined that if a DNAPL were present, the concentrations would have stayed constant. Ultimately, the IPEA was satisfied that DNAPL was not present and approved General Electric's Focus Site Investigation Report.

As to a potential third degreaser, Dr. Vagt recalled that a General Electric employee testified that there may have been a third degreaser in Building 14 that

---

[7] "CSAT" or the soil saturation limit means "the contamination concentration at which the absorptive limits of the soil particles, the solubility limits of the available soil moisture, and saturation of soil pore air have been reached. Above the soil saturation concentration, the assumptions regarding vapor transport to air and/or dissolved phase transport to groundwater (for chemicals that are liquid at ambient soil temperatures) do not apply, and alternative modeling approaches are required." 35 Ill. Adm. Code § 742.200.

used TCA or TCE. However, the soil samples taken near Building 14 either detected no TCA/TCE or low levels of it. Based on this evidence, Dr. Vagt opined and the IEPA agreed, that no further testing was necessary to determine if a third degreaser was located in Building 14. Furthermore, Dr. Vagt determined that groundwater was flowing south from Building 14, not north as Dr. Banaszak testified. The conceptual site model Dr. Banaszak relied on was preliminary. After that preliminary model was made, Dr. Vagt revisited the site and discovered that the high point in the groundwater was several hundred feet farther north of Building 14 than he previously thought, which would cause the groundwater to flow south from Building 14.

Dr. Vagt also maintained his conclusion that City Well 1 was the only conduit for contaminants to travel below the Maquoketa Shale. Once City Well 1 was sealed and closed in 1988, the TCE concentrations dropped significantly in the first two years and continued dropping slowly after that. Dr. Vagt opined that this data revealed that City Well 1 was the conduit and that there were no other natural ways for contamination to get into the deep aquifer below the Maquoketa Shale. Dr. Vagt calculated that it would take 4,000 years for water to travel through to the bottom of the Maquoketa Shale at a rate of 1/20 of a foot per year. Dr. Vagt testified that based on the seepage rate of the Maquoketa Shale even if TCE were present in the ground, it would only have traveled 5 or 6 feet into the Shale. Therefore, Dr. Vagt did not recommend drilling into the Maquoketa Shale because the only

contamination of the deep aquifer has been through man-made bore holes or wells, like City Well 1.[8]

Based on the evidence presented at the hearing, the Court finds that General Electric's investigation into the presence of DNAPL and the IEPA's approval of this investigation and ultimate determination that no DNAPL existed was not unreasonable. Therefore, Plaintiffs have not met their burden to show that additional testing for DNAPL is necessary to determine the proper scope of any remediation for the site.

Rock Creek

The parties dispute whether Rock Creek is a groundwater divide that would prevent contamination from flowing underneath Rock Creek and to the south. Plaintiffs argue that trace amounts of TCE present in the south irrigation well located south of Rock Creek is evidence of this. Plaintiffs believe that the contamination is moving through the competent bedrock under Rock Creek and into the south irrigation well. Plaintiffs further believe that the 6 monitoring wells on the south side of Rock Creek,[9] which did not detect site-related contaminants in the groundwater samples, are not deep enough to reveal any contamination because

---

[8] The principle of *primum non nocere* is apparently applicable in environmental studies as well.

[9] Namely MW11, MW11-LS, MW 12, MW12-LS, MW13, MW13-LS.

they are shallower than the level at which groundwater and contamination move through the bedrock.[10]

At the hearing, General Electric maintained that Rock Creek is a groundwater divide. Dr. Vagt relied on the gage data for Rock Creek and the samples taken from the two monitoring wells installed north of Rock Creek, MW 7 and 8, to conclude that Rock Creek was a groundwater divide. General Electric asserted this conclusion in their Focused Site Investigation Report. The IEPA requested additional information and required the installation of monitoring wells and the testing of residential wells to the south of Rock Creek to confirm General Electric's conclusion. Dr. Vagt determined that the lack of site contaminants in these wells confirmed his conclusion that Rock Creek prevented contaminants from moving past it. Dr. Vagt testified that a single sample revealing trace amounts of TCE from the south irrigation well did not overshadow the lack of contamination detected in samples taken from 6 monitoring wells and the residential wells located

---

[10] Similarly, Dr. Banaszak believed that the shallow depth of the monitoring wells skewed the evaluation of potentiometric pressure, which pulls groundwater from a higher pressure in the monitoring well to a lower pressure. Dr. Banaszak opined that the data collected by General Electric revealed that Rock Creek was pulling groundwater into it, which would make it a groundwater divide; however, he believed this data was incomplete. Dr. Banaszak testified that there is evidence from 1999 that Rock Creek was a losing stream (it was losing its water to the aquifers below), which would allow contamination to flow under Rock Creek.

However, Dr. Vagt testified that the gage data collected by the United States Geological Survey on almost a daily basis from 1978 through 1985 about Rock Creek reveals it is predominately a gaining stream. A gaining stream would pull groundwater into it from both sides and beneath it, creating a groundwater divide. Dr. Vagt testified that Rock Creek is a gaining stream about 90% of the time and that the data Dr. Banaszak relied on from 1999 indicating it was a losing stream was likely during one of these intermittent changes. Dr. Vagt further testified that even though the daily gage data only went through 1985, it was representative of how Rock Creek would act in 2012, namely that it remained predominately a gaining stream.

south of Rock Creek that were at differing depths and in close proximity to the south irrigation well. Dr. Vagt opined that pumping from the south irrigation well, which is beyond the wells that were sampled, was likely pulling TCE from under Rock Creek toward the well. Based on this explanation, the IEPA determined that additional investigation and sampling was unnecessary.

Accordingly, the testimony at the hearing reveals that Plaintiffs merely interpreted the data differently than General Electric and the IEPA. However, Plaintiffs have offered no additional testing that would seriously challenge the finding that Rock Creek is a groundwater divide, and have therefore provided no basis for ordering a new, longer-term investigation into the site.


Vapor Intrusion

Plaintiffs seek to determine the extent of the vapor intrusion into the homes and clubhouse. They also seek implementation of long-term vapor intrusion monitoring. At the hearing, Plaintiffs informed the Court that the home once owned by Lowell Beggs and Martha Kai Conway had been sold. Plaintiffs agreed that the Court cannot force access into the home for testing and monitoring. Accordingly, Plaintiffs asked the Court to order General Electric to obtain consent from the new owners to implement the vapor intrusion monitoring not only for this home, but for the surrounding residences as well.

Plaintiffs assert that 1,2-dichloroethane ("1,2-DCA") was detected inside Plaintiffs' former home and is the same compound from the plant contamination.

Based on the detection of 1,2 DCA, Plaintiffs argue that General Electric should be required to investigation where the contaminants came from, even if they were not site related.

General Electric maintains that vapor intrusion is not an issue because no site-related contaminates were found in the groundwater and sub-slab samples taken from under and around Plaintiffs' former home, regardless of whether contaminants were detected in the indoor air. The investigation into the indoor inhalation exposure revealed that there was not a complete pathway between the source of site-related contamination around or under the home and the indoor air, noting that 1,2-DCA, which was not detected in the samples taken from the groundwater or the sub-slap vapor, could come from a number of sources unrelated to the site contamination. Without a complete pathway, any additional investigation into the source of 1,2-DCA would be unnecessary. The IEPA agreed with this conclusion and did not require additional testing. This Court is not in a position to second guess the IEPA's decision based on Plaintiffs' discontent with the decision.

*     *     *

For all the reasons stated above, the Court finds that Plaintiffs have not met their heavy burden to show they are entitled to a mandatory permanent injunction. This Court is not in a position to second guess the well-reasoned decisions of General Electric and the IEPA with respect to the site investigation. The IEPA has consistently pushed back on General Electric's proposals since 2010. And the

IEPA's rejection of General Electric's Remedial Action Plan is just the latest example. The IEPA's actions, including the latest rejection, is strong evidence that Plaintiffs' injuries are being remedied in the parallel state-court proceeding. The Court sympathizes with Plaintiffs about the delay in cleaning up the site, but as Dr. Banaszak indicated, any investigation into the site requires data collection over a long period of time to determine the trends in the contamination and how that is affected by the groundwater flow. The IPEA is satisfied with General Electric's investigation to date and has moved on to evaluating what remedial measures are necessary for this site.[11] Obviously, what has satisfied the IEPA has not satisfied Plaintiffs. But Plaintiffs' lack of satisfaction does not mean that they have met their high burden to obtain a mandatory permanent injunction. The IEPA has even shared Plaintiffs' concerns over the proposed use of institutional controls and monitored natural attenuation. However, this Court will leave it to General Electric to provide additional support for its proposed plan or modify it in accordance with the IEPA's requirements.

## CONCLUSION

The Court recognizes that the IEPA is not seeking every aspect of relief Plaintiffs desire and that General Electric may seem like it has been dawdling for decades. Plaintiffs have the Court's sympathies in this regard. But sympathy is

---

[11] It is important to remember the issue before the Court. The issue is whether Plaintiffs have met their burden of showing irreparable harm so that a completely new investigation of the site should be ordered, despite the IEPA's approval of the investigation to date. The issue is not whether the Court necessarily agrees with General Electric's proposed remedy of natural attenuation and monitoring with institutional controls. Indeed, the IEPA's rejection of that remedy as proposed is strong evidence that irreparable harm was not established.

not a basis upon which to grant a mandatory permanent injunction that would disrupt the actions taken under the Consent Order. *Holbrook v. University of Virginia*, 706 F. Supp. 2d 652, 653 (W.D. Va. 2010). A reasonable person might disagree with this Court's determination, but that disagreement does not necessarily mean this Court abused its discretion in denying the relief. *United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996). Moreover, it is important to remember that Plaintiffs' Comprehensive Environmental Response, Compensation, and Liability Act claim remains at this stage of the litigation. Plaintiffs are not currently without a remedy in this case, in addition to the remediation efforts sought by the IEPA and Illinois Attorney General under the Consent Order. Indeed, Plaintiffs' hopes of a more expansive remediation should be buoyed by the IEPA's recent rejection of General Electric's Remediation Action Plan.

Plaintiffs' request for a mandatory permanent injunction is denied. Plaintiffs have failed to establish irreparable harm.

Dated: September 7, 2017          By: _____
                                       Iain D. Johnston
                                       U.S. Magistrate Judge